**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

CALVIN WILLIAMS,

          Defendant.

Case No. 22-cr-91-CJW-2

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO
SUPPRESS**

_____

**TABLE OF CONTENTS**

                                        **Page**

I.     *INTRODUCTION*.................................................................2

II.    *FINDINGS OF FACT*.......................................................3

III.   *DEFENDANT'S REQUEST FOR SANCTIONS* ...................................10

IV.  *THE GOVERNMENT'S TIMELIENESS ARGUMENT*............................13

V.    *DISCUSSION*................................................................14

       A.   *Parties' Arguments* ................................................14

       B.   *Relevant Law* .......................................................16

       C.   *Analysis*................................................................23

       D.   *Summary of Recommendations* .................................40

VI.  *CONCLUSION* ............................................................42

Case 1:22-cr-00091-CJW-MAR   Document 183   Filed 06/08/23   Page 1 of 42

# I.    INTRODUCTION

On November 2, 2022, the Grand Jury returned an Indictment, charging Defendant with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), 846, and 851 and one count of Conspiracy to Commit Money Laundering 18 U.S.C. Section 1956(h).  (Doc. 11.)

The matter before me is Defendant's motion to suppress.  (Doc. 128.)  The motion contained an inventory of items to be suppressed which includes evidence of methamphetamine seized on September 30, 2022 during a vehicle stop in New Mexico and evidence derived from that search, including admissions made by Defendant concerning his knowledge or possession of methamphetamine and other statements he made during or immediately after the traffic stop and vehicle search.  (*Id*. at 1.)  The Government timely filed a response.  (Doc. 136.)  On May 3, 2023, Defendant filed a reply to the Government's response.  (Doc. 151.)  The Honorable C.J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on May 4, 2023.  (Doc. 153.)  On May 11, 2023, with leave of the Court, the Government filed a Supplemental Brief (Doc. 172), and Defendant filed a Supplemental Brief.  (Doc. 173.)

The motion arises from law enforcement's stop and subsequent search of Defendant's vehicle.

At the hearing, the following Government exhibits were admitted without objection:

1. U.S. Postal Inspection Form dated September 30, 2022, filed at Doc. 137-1;

2. Officer Nicholas Jackson's report, filed at Doc. 137-2;

3. Officer Jackson's dash camera video;

4. Officer Jackson's dash camera video (panoramic view);

5. Officer Armijo's body camera video;

6. Drug Enforcement Administration Chemical Analysis Report, filed at Doc. 136-1;

7. Guide to New Mexico law regarding Following Too Closely, filed at Doc. 136-2;

8. New Mexico Uniform Traffic Citation form, filed at Doc. 149;

9. Vehicle plate and registration information, filed at Doc. 150; and

10. Email from Jacob Hoch (DEA) to Nicholas Jackson with Vehicle Detection Report, filed at Doc. 151.

Defendant seeks to suppress methamphetamine seized during the traffic stop and vehicle search. Evidence derived from that search, including admissions made by Defendant concerning his knowledge or possession of methamphetamine, and other statements he made during or immediately after the traffic stop and vehicle search. (Doc. 128.)

At the hearing, the following defense exhibits were admitted without objection:

A. Criminal Complaint filed in the United States District Court for the District of New Mexico, filed at Doc. 152-1.

The Government called two witnesses: Officer Nicholas Jackson and U.S. Postal Inspector Bryce Husak. I found the witnesses credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

On September 30, 2022, Inspector Husak and DEA Special Agent Jacob Hoch interviewed a Confidential Source ("CS") at the DEA Office in Cedar Rapids, Iowa.[1] (Husak Hr'g Test. at 78, Gov. Exhibit 1.) The CS told Inspector Husak and Special

---

[1] Inspector Husak is employed by the United States Postal Inspection Service in Cedar Rapids, Iowa.

Agent Hoch that, days prior to the interview, Defendant came to the CS's house inquiring whether the CS wanted to advance money towards methamphetamine that Defendant was driving to Phoenix, Arizona to pick up and bring back to Cedar Rapids. The CS did not request or advance any money toward the methamphetamine being picked up in Arizona. (*Id.* at 78-79; Gov. Exhibit 1.) The CS also told Inspector Husak and Special Agent Hoch that Defendant was driving a white Chevrolet sedan and that the CS understood that Defendant was leaving directly for Phoenix from the CS's house. (*Id.* at 79; Gov. Exhibit 1.)

Inspector Husak noted that law enforcement had spoken with the CS a couple days prior to the September 30, 2022 interview and prior to that in the late 1990s.[2] (*Id.* at 80.) In the conversation prior to September 30, 2022, the CS told law enforcement that in 2021 the CS and Defendant had an arrangement where they sourced methamphetamine to each other depending on the cost, sourcing, and quantity available to each of them. (*Id.*) The CS also told law enforcement that he knew Defendant lived off Blairs Ferry Road in Cedar Rapids. (*Id.*)

The CS's information regarding the type of car Defendant drove and where he lived was consistent with information investigators already knew. Specifically, investigators were aware that Defendant lived off Blairs Ferry Road because, in November 2021, investigators had executed a search warrant at Defendant's residence,

_____

[2] In 1997, the CS was a cooperator who provided some information on individuals involved in drug dealing. The CS has multiple drug related convictions, including a federal conviction for conspiracy to distribute cocaine base and being a felon in possession of a firearm. The CS also has pending federal charges for conspiracy to distribute a controlled substance and being a felon in possession of a firearm. On September 28, 2022, prior to speaking with Inspector Husak and Special Agent Hoch, the CS had informed law enforcement about debt collection related to methamphetamine transactions with another target in Cedar Rapids. After September 30, 2022, the CS was also involved in an attempted controlled drug purchase. Later, the CS was made aware of a warrant for his arrest and absconded from law enforcement until he was eventually arrested many days later. (Husak Hr'g Test. at 90-93.)

which was located off Blairs Ferry Road. (*Id.* at 81.) Investigators were also aware of the type of vehicle Defendant drove. As part of the investigation into the drug distribution conspiracy involving Defendant, investigators had observed Defendant in a white Chevrolet sedan with Iowa license plate JPT331. (*Id.* at 81-82.)

On September 30, 2022, after the interview with the CS, investigators ran a records check on Defendant's vehicle. The records check revealed that the license plate and registration on Defendant's vehicle had recently been changed to Iowa license plate LQJ205 and the vehicle was registered to ANC Transportation, a known business of Defendant. (*Id.* at 82-83; Gov. Exhibits 1 & 9.) Investigators knew that ANC Transportation belonged to Defendant based on records found during the search of Defendant's residence and records found at the business address which also had been searched pursuant to a warrant. (*Id.* at 84-85.) Investigators also ran the Defendant's license plate (Iowa LQJ205) through the License Plate Reader ("LPR") system which revealed that the plate had been recorded driving east on Interstate 40 in New Mexico, a few minutes prior to running the plate through the LPR system. (*Id.* at 85-86; Gov. Exhibits 1 & 10.) Inspector Husak noted that traveling eastbound through New Mexico is consistent with the route one would take to return to Cedar Rapids from Phoenix. (*Id.* at 86; Gov. Exhibit 1.)

Inspector Husak contacted Officer Jackson, who was working in New Mexico, and generally described the investigation of Defendant in Iowa to him.[3] Inspector Husak

---

[3] Officer Jackson is employed by the United States Department of Interior, Bureau of Indian Affairs, Division of Drug Enforcement, K-9 Unit, in the South Region. He is assigned to the United States Homeland Security Investigations, Criminal Interdiction Unit. He is also a part-time K-9 handler and conducts high-volume traffic stops in multiple states, including Arizona, New Mexico, Colorado, Utah, and Nevada. Prior to his current employment and assignment, he was a patrol officer in Fort Belvoir Police Department, Virginia, Quantico, Virginia, and Albany, Georgia. (Jackson Hr'g Test. at 5-6.) On September 30, 2022, Officer Jackson was working in New Mexico.

also told Officer Jackson that, based on information from a CS, Iowa law enforcement believed that Defendant was traveling from Cedar Rapids to Phoenix to pick up an unspecified amount of methamphetamine to bring back to Cedar Rapids at an unknown time. Inspector Husak told Officer Jackson that there was a recent LPR hit in New Mexico, and it appeared Defendant was traveling back to Cedar Rapids. Additionally, Inspector Husak told Officer Jackson that the information shared from the CS was only for information purposes and any decision for enforcement would be Officer Jackson's own decision to make and would be separate from the investigation in Iowa. (*Id.* at 87; Gov. Exhibit 1.)

On September 30, 2022, after speaking with Inspector Husak, Officer Jackson performed his own LPR search on Defendant's vehicle. The search showed that Defendant's vehicle had entered New Mexico at 10:15 a.m. (MST) and was traveling eastbound on Interstate 40. Based on Officer Jackson's location on Interstate 40, he was certain that Defendant's vehicle would pass his location in approximately one hour.[4] (Jackson Hr'g Test. at 8-10.) Specifically, Officer Jackson was in his patrol car, which was parked in the center median perpendicularly to the traffic lanes such that traffic in the eastbound lane on Interstate 40 would pass in front of his vehicle. (*Id.* at 11.)

At approximately 11:36 a.m., Officer Jackson observed Defendant's vehicle approaching his position. Officer Jackson noted that as Defendant's vehicle approached him, the vehicle's speed reduced and was traveling directly behind a commercial motor vehicle ("CMV") at a distance of one and one-half car lengths. As Defendant's vehicle passed Officer Jackson, it maintained the distance of one and one-half car lengths behind the CMV. (*Id.* at 11-13; Gov. Exhibit 2.) In a guide used by New Mexico law

---

[4] At the time of the LPR search, Officer Jackson was performing his usual duties conducting traffic enforcement on the eastbound lanes of Interstate 40 in New Mexico. (Jackson Hr'g Test. at 10.)

enforcement officers, vehicles traveling 65 miles per hour should have 95 feet distance between them and vehicles traveling 75 miles per hour should have 110 feet distance between them. (*Id.* at 13; Gov. Exhibit 7.) Officer Jackson testified that keeping the proper distance between vehicles promotes safety and avoids accidents. (*Id.* at 15.) Further, Officer Jackson noted that at the distance Defendant's vehicle was traveling behind the CMV, the driver of the CMV would not have been able to see Defendant's vehicle, creating an additional safety risk. (*Id.* at 17-18.) Based on his observation of one and one-half car lengths between Defendant's vehicle and the CMV, Officer Jackson determined that Defendant's vehicle was following too closely to the CMV in violation of New Mexico law,[5] and Officer Jackson decided to stop Defendant's vehicle. (*Id.* at 18-19; Gov. Exhibit 2.)

After other traffic on Interstate 40 passed, Officer Jackson left the center median to catch up to Defendant's vehicle and conduct a traffic stop. (*Id.* at 19.) Officer Jackson testified that, even without contact from law enforcement in Iowa, he would have conducted the stop of Defendant's vehicle based on Defendant's vehicle traveling too closely to the CMV. (*Id.* at 19.) Officer Jackson explained that:

> we stop vehicles mainly that contribute to safety infractions on our roadways, and I conduct high-volume stops every day that I go out, so this would have been a vehicle that I probably would have been of interest in. And furthermore, I would consider this type of driving, with my training, to be driving behavior associated with my presence in a center median in a fully marked vehicle when I'm out conducting criminal patrol. So typically in our area when people see us, they'll slow down, but after they have passed, they pick back up and they continue on what they were initially doing. In this particular case, this vehicle, when I—it first came into sight, maintained its distance behind the commercial motor vehicle as it passed me, and then after it passed me, the same. The vehicle never went around

---

[5] The pertinent law is NM ST Section 66-7-318, providing that "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon the condition of the highway.

the tractor trailer, and it basically just continued to follow. So for me, as far as driving behavior is concerned and working criminal interdiction, this vehicle, in conjunction with the underlying violation for following too close, would have drawn my attention.

(*Id.* at 20.) As Officer Jackson drove to catch up to Defendant's vehicle, his emergency lights were not activated and he observed that Defendant's vehicle continued to follow too closely to the CMV, at a distance of 50 to 60 feet. Still following the CMV, Defendant's vehicle began to pass a freight truck but, after noticing Officer Jackson approaching, the driver of Defendant's vehicle abruptly slowed down and moved to the right behind the freight truck, also at an unsafe distance. (*Id.* at 21-22.)

At this point, Officer Jackson activated the emergency lights on his patrol vehicle and moved from the left lane into the right lane behind Defendant's vehicle. Defendant's vehicle pulled over to the side of the road. Additionally, at the time Officer Jackson initiated his pursuit of Defendant's vehicle, Cibola County Sheriff's Office Deputy Julian Armijo had been stationed with Officer Jackson in another patrol vehicle in the median on Interstate 40.[6] Deputy Armijo left his position in the median directly behind Officer Jackson and assisted in the stop of Defendant's vehicle. (*Id.* at 22-23.)

Officer Jackson approached the rear passenger side of Defendant's vehicle. Officer Jackson tapped on the rear passenger window and noted three individuals in the vehicle. The driver was Troy Mercadel. James Collins was in the front passenger seat and Defendant was in the rear passenger's side seat. Officer Jackson requested Mercadel's driver's license and the vehicle's registration, which were provided to Officer Jackson by Mercadel and Defendant. Officer Jackson advised Mercadel that he would be issuing him a warning for following too closely and instructed Mercadel to exit the vehicle and accompany him to his patrol car. Mercadel complied and they went to Officer

---

[6] Deputy Armijo was a K-9 Officer. He no longer works for the Cibola County Sheriff's Office.

Jackson's patrol car. Officer Jackson had Mercadel stand near the front passenger side corner of the patrol car. Officer Jackson opened the front passenger door of his patrol car and stood on the other side of the door from Mercadel, creating a barrier between them. Officer Jackson positioned his computer so that he could run the records check on Mercadel from the front passenger side of his patrol vehicle. After running the records check, Officer Jackson grabbed his clip board and began filling out the warning form for Mercadel. (*Id.* at 24-29; Gov. Exhibit 2.)

While Officer Jackson was conducting the records check, Deputy Armijo spoke with the passengers. Deputy Armijo asked Collins and Defendant to exit the vehicle because he intended to deploy his dog for a sniff of the exterior of the vehicle. Collins and Defendant exited the vehicle and stood on the far-right shoulder of the interstate while Deputy Armijo deployed his dog on the exterior of the vehicle. Deputy Armijo deployed his dog at the same time Officer Jackson was performing the records check and writing the warning. (*Id.* at 32). Deputy Armijo finished the dog sniff of the vehicle before Officer Jackson finished writing the warning. (*Id.* at 34.)

While writing the warning, Mercadel told Officer Jackson that he had recently been stopped for the same infraction—following too closely—and agreed to the written warning and signed it. (*Id.*) When Officer Jackson was done with the citation, Deputy Armijo spoke with Mercadel and informed him that his dog is trained to alert to marijuana, cocaine, methamphetamine, and heroin. Deputy Armijo also told Mercadel that his dog had a positive alert on the vehicle. Deputy Armijo asked Mercadel whether any of the four drugs his dog was trained to alert on were inside the car. Mercadel responded that he possessed a personal amount of marijuana in his black luggage inside the trunk of the vehicle. Officer Jackson and Deputy Armijo asked Mercadel's permission to search the vehicle. Mercadel gave them permission to search his luggage

but stated that he was not the owner of the car and identified Defendant as the vehicle's owner. (*Id.* at 36-37.)

Officer Jackson and Deputy Armijo spoke with Defendant, who confirmed that the vehicle belonged to him. Defendant was advised that Deputy Armijo's dog had alerted for drugs inside the vehicle. Defendant was also advised that Mercadel told them marijuana was in the trunk of the car. The officers asked Defendant for his consent to search the vehicle. Defendant gave consent to search Mercadel's luggage but did not consent to a search of the entire vehicle. (*Id.* at 38.)

Officer Jackson informed Defendant that, based on the positive dog alert and Mercadel's admission regarding the marijuana, he had "federal probable cause" to search the vehicle at that time. Upon searching the vehicle, law enforcement found four bundles of methamphetamine located in the trunk liner. (*Id.* at 39; Gov. Exhibit 2.) Upon locating the drugs, Defendant, Mercadel, and Collins were all taken into custody. (Gov. Exhibit 2.)

### III.    DEFENDANT'S REQUEST FOR SANCTIONS

Defendant argues that, prior to filing his motion to suppress, the Government failed to disclose that there was a CS that supplied information to law enforcement in Iowa, which was then relayed to law enforcement in New Mexico. (Doc. 151 at 1.) Defendant points out that "[n]one of the reports of the New Mexico law enforcement regarding the traffic stop reference the CS information or contact with Iowa authorities; no report from the Iowa authorities regarding their interview with the CS was provided in the discovery materials." (*Id.* at 1-2.) Defendant contends that "[t]he evidence of the real reason for the traffic stop—the information provided by the CS—was withheld by the government, and disclosed only when it benefited the government." (*Id.* at 2.) Defendant maintains that the appropriate sanction for violating the Stipulated Discovery Order is to grant his motion to suppress. (*Id.*)

The Government responds that, at the time Defendant's motion to suppress was filed, no report detailing the CS's statements to investigators on September 30, 2022 existed. (Doc. 172 at 5.) The Government maintains that once the report was written it was provided to Defendant. (*Id.*) The Government also asserts that, after the motion to suppress was filed, investigators were contacted "to determine if there were any other materials related to investigative steps taken by investigators on September 30, 2022." (*Id.*) In response to the Government's inquiry, investigators provided the Government with vehicle registration information from a search conducted on September 30, 2022, the LPR hit from September 30, 2022, and an email sent from investigators in Iowa to Officer Jackson on September 30, 2022. (*Id.*) The Government states that this information was provided to Defendant prior to the suppression hearing, and notes that the information was offered in Government Exhibits 9 and 10 without objection. (*Id.*) The Government argues that there has been no discovery violation and sanctions are unwarranted because "Defendant had all of these materials in advance of the suppression hearing, . . . [D]efendant was able to cross-examine the two witnesses concerning these materials[,]" and Defendant was "provided these materials well in advance of trial." (*Id.*)

> The Stipulated Discovery Order entered in this case provides in pertinent part that:
>
> The Government will include in its discovery file, or otherwise make available, law enforcement reports . . . grand jury testimony and evidence or existing summaries of evidence in the custody of the United States Attorney's Office that provide the basis for the case against Defendant. The file will include Rule 16, *Brady*, and Jencks Act materials of which the United States Attorney's Office is aware and possesses.

(Doc. 113 at 1.) The Stipulated Discovery Order also provides that the parties have "a continuing duty to disclose" pursuant to Federal Rule of Criminal Procedure 16(c). (*Id.* at 4.) Fed. R. Crim. P. 16(c) provides that:

(c) Continuing Duty to Disclose. A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if:

> (1) the evidence or material is subject to discovery or inspection under this rule; and

> (2) the other party previously requested, or the court ordered, its production.

At the suppression hearing, Inspector Husak acknowledged that on September 30, 2022, when he spoke with the CS, neither he nor Special Agent Hoch made a written report regarding what the CS said, and the steps law enforcement took to corroborate the CS's statements. (Husak Hr'g Test. at 89.) Inspector Husak explained the reasoning for not making a written report on or around September 30, 2022:

> It was imperative to us that we protect our CS because at the time the CS was providing information related to this investigation and other investigations and we wanted to ensure that that was able to continue. Additionally, we wanted to ensure that any information we provided to Officer Jackson was completely separate from any investigation up here because [Defendant] had not yet been indicted in the Northern District of Iowa on our conspiracy case.

(*Id.*) Inspector Husak testified that a written report was completed about two weeks before the suppression hearing in response to the motion to suppress filed by Defendant. (*Id.* at 89-90.) The Government states that once the report was written, it was provided to Defendant. (Doc. 172 at 5.) Similarly, after inquiring about additional materials related to the investigation on September 30, 2022 and receiving additional materials from law enforcement, the Government provided this information to Defendant prior to the suppression hearing and well in advance of the trial. The written report and additional materials were admitted into evidence at the suppression hearing without objection. (Gov. Exhibits 9 & 10.) Defendant does not dispute that the Government disclosed the written report and additional materials prior to the suppression hearing. Furthermore,

12

there is no evidence that the Government failed to timely disclose the information, providing Inspector Husak's report once it had been completed and providing the additional materials once it received them from law enforcement. Moreover, at the suppression hearing, Defendant had the opportunity to cross-examine the Government's witnesses regarding the report and additional materials. Thus, based on the foregoing, I find no discovery violation and recommend no sanctions be imposed against the Government. Defendant relies on a single case, *United States v. Davis*, 244 F.3d 666 (8th Cir. 2001), in support of his request for sanctions, however, such reliance is misplaced. *Davis* is easily distinguishable from this case, as *Davis* involved an actual discovery violation, which I do not find here.

## IV.  THE GOVERNMENT'S TIMELIENESS ARGUMENT

The Government argues that "[a]ny issues not raised by [D]efendant in his motion to suppress filed on April 17, 2023, should not be considered by this Court, and they should be denied as untimely." (Doc. 172 at 10-11.) The Government maintains that "[a]llowing defendant to raise new issues at the suppression hearing or in supplemental briefing puts the government in a position where it is not able to adequately respond and present evidence." (*Id.* at 11.) The Government urges that, "[i]n the event defendant raises new issues in his supplemental briefing and the Court finds that defendant has shown good cause and permits [D]efendant to raise the new issues, the government would respectfully request and opportunity to respond and present evidence to full develop the record on any new issues that may be raised." (*Id.* at 12.)

First, pursuant to Fed. R. Crim. P. 12(b)(3)(C) and LCrR 12, Defendant timely filed his motion to suppress on April 17, 2023, Defendant's deadline for filing a motion to suppress. Second, the cases cited by the Government address a situation where a defendant files a motion to suppress after his or her deadline to file such a motion. That is not the situation here and the cases cited by the Government are unavailing. At the

13

suppression hearing, on cross-examination of Officer Jackson, defense counsel questioned Officer Jackson regarding the legality of marijuana in New Mexico and any implications that may have for the legality of the dog sniff and vehicle search. (Jackson Hr'g Test. at 60-62.) While Defendant did not discuss whether the legality of marijuana in New Mexico would affect the constitutionality of the vehicle stop and search in his opening brief, such questioning was reasonable at the suppression hearing. At the end of the hearing, I gave the parties one week to file supplemental briefing, suggesting that that they address the issue of whether the legality of marijuana in New Mexico affected the traffic stop and/or vehicle search. (Hr'g Test. at 106.) Both parties addressed the issue in their supplemental briefs. Thus, the Government's concern that it would not have the opportunity to respond is of no consequence here. Accordingly, I recommend that the timeliness issue raised by the Government be denied as moot.

## V.    DISCUSSION

### A.    Parties' Arguments

Defendant argues that the traffic stop violated the Fourth Amendment because "no traffic violation occurred under New Mexico law." (Doc. 128-1 at 4.) Defendant raises a concern that, because "Homeland Security officers are not in the business of traffic law enforcement, Officer Jackson's purported viewing of a traffic violation may be means for false grounds for a traffic stop to carry out a drug investigation." (*Id.* at 5.) Defendant also maintains that the "traffic stop was unconstitutionally prolonged." (*Id.* at 6.) Defendant contends that instead of writing the warning, Officer Jackson interrogated Mercadel regarding information outside the purview of the traffic stop which improperly prolonged the stop. (*Id.*) Defendant also argues that the dog sniff of Defendant's vehicle unconstitutionally prolonged the stop. (*Id.* at 9.)

In his reply brief, Defendant asserts that the "traffic stop was not supported by probable cause." (Doc. 151 at 3.) Relying on Government's Exhibit 3, which is dash

camera video of the traffic stop, Defendant argues that the video does not demonstrate a violation of New Mexico's following too closely law. (*Id.* at 3-4.) Defendant notes that, "[a]lthough there is a significant amount of video from [Officer] Jackson's patrol car, there is no video showing that [D]efendant's vehicle followed too closely." (*Id.* at 4-5.) Defendant suggests that Officer Jackson "created the alleged traffic violation in order to investigate the information provided by Iowa authorities." (*Id.* at 5.) Defendant also argues that law enforcement "did not have a reasonable suspicion of drug activity to justify seizure of the Defendant's vehicle." (*Id.*) Defendant maintains that the CS's tip to Cedar Rapids law enforcement which was passed on to Officer Jackson did not create reasonable suspicion. (*Id.*) Defendant raises a concern that Officer Jackson "engaged in the pretext of stopping [Defendant] for a minor traffic violation as an excuse to investigate potential drug trafficking." (*Id.*) Defendant also argues that the record lacks evidence as to the veracity of the CS's tip and the reliability of the CS. (*Id.* at 7-10.)

In his post-hearing brief, Defendant argues that the "K-9 alert did not create probable cause to search [the] vehicle." (Doc. 173 at 1.) Defendant points out that, while Deputy Armijo's K-9 was trained to detect marijuana, cocaine, heroin, and methamphetamine, when the K-9 performed the sniff of Defendant's car, the K-9 could not indicate which specific drug it alerted on. (*Id.* at 2.) Defendant also points out that, under New Mexico state law, an individual may have up to two ounces of marijuana for personal use. (*Id.* at 3.) Thus, Defendant contends that the "vehicle, containing three persons, could have legally contained up to six ounces of marijuana without being in violation of the law" and "[b]ecause the K-9 alerted on the [D]efendant's vehicle and officers could not tell whether the alert was for marijuana, probable cause did not exist." (*Id.*) Defendant also argues that the traffic stop violated the Fourth Amendment, raising concerns that, "[g]iven [Officer] Jackson's incentive to stop the [D]efendant because he had been told there might be drugs in the car, [and] the convenient absence of video

evidence is suspicious." (*Id.* at 7.) Defendant asserts that "New Mexico law gives the drivers the discretion to determine whether they are driving in a manner which is prudent" and "[t]he videos show that [D]efendant's vehicle was driven in a prudent manner." (*Id.* at 8.) Thus, Defendant contends that "Officer Jackson's testimony did not establish that his judgment of a 'reasonable and prudent' following distance was any better than the driver's." (*Id.*) Defendant also asserts that the collective knowledge doctrine does not justify the stop. (*Id.*)

The Government argues that "Officer Jackson had probable cause to stop Defendant's vehicle because he observed a traffic violation." (Doc. 137 at 5.) Specifically, the Government argues that Officer Jackson observed Defendant's vehicle following a CMV too closely, giving him probable cause to stop Defendant's vehicle. (*Id.* at 6.) Alternatively, the Government asserts that, "[e]ven without a traffic violation, Officer Jackson had reasonable suspicion to stop the vehicle based on [the] CS's corroborated tip." (*Id.* at 7.) Specifically, the Government relies on the collective knowledge doctrine to argue that "[t]he investigative team corroborated [the] CS's tip regarding the vehicle, location, and general timeframe before the vehicle was stopped by Officer Jackson" and "[b]ased on the corroboration of [the] CS's tip, Officer Jackson had reasonable suspicion to stop [Defendant's vehicle]." (*Id.* at 8-10.) Further, the Government argues that "[t]he traffic stop was not unconstitutionally prolonged by the dog sniff because the dog sniff occurred while the traffic violation was being processed." (*Id.* at 10.) In its supplemental brief, the Government argues that "New Mexico's legalization of marijuana at the state level does not make the search unconstitutional" because "[m]arijuana is still a federally controlled substance." (Doc. 172 at 12.)

**B.**     *Relevant Law*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

Const. amend. IV. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted). "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Officers may only conduct investigatory stops if they have reasonable suspicion that criminal activity may be afoot. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).

Reasonable suspicion is based on "both the content of the information possessed by police and its degree of reliability." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015) (quoting *Cortez*, 449 U.S. at 417). A hunch does not constitute reasonable suspicion to justify a stop. *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (citing *Terry*, 392 U.S. at 27). Rather, officers must be able to articulate "some minimal, objective justification for an investigatory stop." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009) (quoting *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004)). However, "[e]ven an officer's incomplete initial observations may give reasonable suspicion for a traffic stop." *Givens*, 763 F.3d at 989 (quoting *Hollins*, 685 F.3d at 706).

*United States v. Harvey* succinctly articulated the concept of reasonable suspicion in the context of a traffic stop:

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S. Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behaviors; jurors as fact-finders are permitted to do the same and so are law enforcement officers.

*United States v. Cortez,* 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981). Inherent in the concept of reasonable suspicion is the fact that officers may be mistaken in their beliefs. The keystone in such cases hinges on reasonableness. Under the law, "a reasonable but mistaken belief may justify an investigative stop." *United States v. Bailey,* 417 F.3d 873, 877 (8th Cir. 2005). *See also United States v. Garcia–Acuna,* 175 F.3d 1143, 1147 (9th Cir. 1999) ("A mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.").

No. 14-00029-11-CR-W-GAF, 2015 WL 1197918, at *4 (W.D. Mo. Mar. 16, 2015).

In the context of traffic violations, a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox,* 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin,* 411 F.3d 998, 1000 (8th Cir. 2005)). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States,* 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis,* 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney,* 456 F.3d 850, 855-

56 (8th Cir. 2006)).  An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop.  *Id.*

"A seizure for a traffic violation justifies a police investigation of that traffic violation." *Rodriguez*, 575 U.S. at 354.  The constitutionally acceptable length of the seizure of the individual involved "is determined by the seizure's 'mission.'" *Id.* (citing *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)).  Stops may last no longer than necessary to allow officers to achieve their stated purpose. *Id.* (citations omitted); *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)).  "A seizure justified only by a police-observed traffic violation . . . 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Caballes*, 543 U.S. at 407) (brackets omitted)).  Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997) (citations and quotation marks omitted).

During a traffic stop, an officer may check a driver's license and registration, ask his destination and purpose, and ask him to step out of the car. *United States v. Linkous,* 285 F.3d 716, 719 (8th Cir. 2002).  Moreover, during a traffic stop, an officer "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks," including a check of the driver's criminal history. *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (citation omitted); *Jones*, 269 F.3d at 924-25 (listing several tasks officers can legally perform on a traffic stop).  While a vehicle is stopped, officers may extend inquiries into matters unrelated to the traffic stop, as long as doing so does not "measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

The necessary length of a stop and necessary investigation will vary based on the circumstances of each case. An officer may detain a driver as long as reasonably necessary to conduct these investigative activities and to issue a warning or citation. *Jones,* 269 F.3d at 925 (citing *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 1997)). If, at any time during a reasonable traffic stop, an officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband," the officer may expand his intrusion into issues unrelated to any traffic offense. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quotations omitted). A dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)); *see also United States v. Nguyen*, 59 F.4th 958, 964 (8th Cir. 2023) ("An open air dog sniff that does not prolong the initial purpose of a stop is permissible"); *United States v. Harry*, 930 F.3d 1000, 1005 (8th Cir. 2019) ("[A]s long as a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful") (quoting *United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016)). However, a dog sniff cannot unreasonably prolong the stop absent "the necessary reasonable suspicion to justify a further detention or unless the continued encounter is consensual." *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) (citations omitted).

Additionally, "[r]easonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972); *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004)). The Eighth Circuit has held that, "[t]hough less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008). In *United*

*States v. Nolen*, 536 F.3d 834 (8th Cir. 2008), the Eighth Circuit explained these distinctions further:

> [T]he Supreme Court has recognized a distinction between "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated," *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), and an anonymous informant, who cannot so easily be held responsible. *See also United States v. Kent*, 531 F.3d 642, 649 (8th Cir.2008) (asserting that a known informant "could be held accountable by [a] detective for [providing] false information"). This distinction is important, because although a tip received from a known informant will more readily support a finding of probable cause, a tip received from an anonymous informant requires "[s]omething more," usually in terms of independent police corroboration, before probable cause may arise. [*Illinois v.*] *Gates*, 462 U.S. [213,] 227, 241. . . .
>
> In addition to there being a distinction between known informants and anonymous informants, there is also an important distinction between the two types of known informants: reliable informants and unproven informants. Reliable informants are individuals who have "a track record of supplying reliable information" to law enforcement officers. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir.1993). Information supplied by such parties may be "sufficiently reliable to support a probable cause finding." *Id.* *See also United States v. Lucca*, 377 F.3d 927, 933 (8th Cir.2004) (asserting "[t]he information from a [confidential reliable informant] is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information."). Unproven informants are individuals without a track record of supplying information to law enforcement officers. "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *Kent*, 531 F.3d at 649. Nevertheless, information supplied by such individuals "requires some independent verification to establish reliability." *Id.* (citing *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir.1995)). "Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." *Brown*, 49 F.3d at 1349.

*Nolen*, 536 F.3d at 839-40. "A[n] . . . informant's tip may support a reasonable suspicion if it has sufficient indicia of reliability[.]" *United States v. Manes*, 603 F.3d 451, 456 (8th Cir. 2010). The following are indicators of an informant's reliability: (1) eyewitness knowledge of facts, *Navarette*, 527 U.S. at 399; (2) predictions of future behavior, *Id.* at 398; *Manes,* 603 F.3d at 456; (3) detailed descriptions of alleged wrongdoing, *Navarette,* 572 U.S. at 398; (4) a track record as a reliable source of information, *Manes,* 603 F.3d at 456; (5) independent corroboration of facts, such as identity, *Id.; Navarette,* 572 U.S. at 398; and (6) contemporaneous reporting of events, such as calling 911 immediately upon viewing criminal behavior, *Navarette*, 572 U.S. at 398-400 (internal citations omitted). *United States v. LaGrange*, No. 18-CR-90-CJW, 2018 WL 6198278, at *6 (N.D. Iowa Nov. 28, 2018).

In general, the reasonable suspicion standard "is 'less demanding' than probable cause and much lower than preponderance of the evidence." *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court explained that:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* . . . demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S. at 147. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be

22

required to establish the requisite quantum of suspicion than would be
required if the tip were more reliable.

*White*, 496 U.S. at 330.

Warrantless searches are *per se* unreasonable, with a few well-established
exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-
called 'automobile exception' permits police to conduct a warrantless search of an
automobile if, at the time of the search, they have probable cause to believe that the
vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41 (citations
omitted). The burden is on the Government to justify warrantless searches. *Carter v.
United States*, 729 F.2d 935, 940 (8th Cir. 1984). There is no dispute in this case that,
if law enforcement had probable cause to believe Defendant's vehicle contained
contraband, that a warrantless search was permissible.

C.    *Analysis*

The initial traffic stop was justified because Defendant was following too closely
in violation of NM ST Section 66-7-318. New Mexico's "following too closely" statute
provides that:

> A. The driver of a motor vehicle shall not follow another vehicle more
> closely than is reasonable and prudent, having due regard for the speed of
> the vehicles and the traffic upon the condition of the highway.

NM ST Section 66-7-318. In *State v. Chavez*, 427 P.3d 126 (N.M. Ct. App. 2018), the
New Mexico Court of Appeals addressed the two-fold issue of whether Section 66-7-318
"provides officers with too much discretion in deciding when the statute has been
violated" and "provides insufficient guidance to the motoring public in determining how
closely they may follow another vehicle without violating the statute," making the statute
unconstitutionally vague. *Id.* at 127. The New Mexico Court of Appeals explained that:

We have already addressed the constitutionality of the "reasonable and prudent" standard of Section 66-7-318 in a non-precedential opinion. . . . In *Sanchez* we held that the provision's "reasonable and prudent" standard provides adequate notice to drivers of what driving behavior is proscribed by the statute. We also held that the provision does not invite ad hoc application or inconsistent enforcement, and that the possibility of flexibility in applying the statute does not overcome the presumption that a given statute is constitutional. In doing so we discussed *United States v. Hunter*, 663 F.3d 1136 (10th Cir. 2011), which rejected a void-for-vagueness challenge to a Kansas statute containing language identical to that found in Section 66-7-318. The *Hunter* court points out that "imprecision in statutes such as the one here simply build in needed flexibility while incorporating a comprehensible, normative standard easily understood by the ordinary driver, and giving fair warning as to what conduct on his or her part is prohibited." *Id*. at 1142 (footnote omitted).

In addition to *Hunter*, a number of opinions from other jurisdictions have come to the same conclusion as we did in *Sanchez*, regarding the constitutionality of the "reasonable and prudent" standard in the context of following too closely. *See, e.g.*, *State v. Harper*, 163 Idaho 539, 415 P.3d 948, 952-53 (Idaho Ct. App. 2018) (stating that a violation of the statute "not need to be reduced to an exact mathematical equation," and that the statute that instructs officers to make judgments based on a reasonable and prudent standard and provides other factors to consider affords drivers notice of the prohibited conduct and guides the discretion of the officers); *Nolan v. State*, 182 So.3d 484, [492-94] (Miss. Ct. App. 2016) (referring to multiple other jurisdictions that have reviewed statutes prohibiting following too closely and have decided those statutes are constitutional, and holding that the statutory language coupled with rules of the road are sufficiently definite to allow an ordinary person to understand the prohibited conduct and avoid arbitrary enforcement from officers); *State v. Harton*, 108 S.W.3d 253, 259-60 (Tenn. Crim. App. 2002) (referring to decisions from other states refusing to find following-too-closely statutes unconstitutionally vague, and concluding that the Tennessee statute gives "fair warning of prohibit[ed] conduct and provides sufficient guidance to prevent arbitrary and discriminatory enforcement"). Our research has not uncovered a single case invalidating a following-too-closely statute on the basis that the "reasonable and prudent" standard is unconstitutionally vague. We note also that the Uniform Vehicle Code, which appears to be

the source for many if not all of the following-too-closely statutes in various jurisdictions, contains exactly the same "reasonable and prudent" language as Section 66-7-318. *See* Nat'l Comm. on Unif. Traffic Laws and Ordinances, *Uniform Vehicle Code & Model Traffic Ordinance* ch. 11, art. III, § 11-310(a) (2000)[.] . . .

We see no reason to depart from the overwhelming weight of precedent addressing this issue.

*Id*. at 127-28 (citations for *Sanchez* omitted).

In *United States v. Diaz-Gomez*, CR No. 10-332 JP, 2010 WL 11483192 (D.N.M. Aug. 25, 2010), a case with facts similar to the facts here, a New Mexico State Police Officer traveling westbound on Interstate 40 near Albuquerque, New Mexico, observed a white pick-up truck traveling eastbound in the left lane. *Id*. at *1. When the officer and the truck passed each other, the officer noted from his radar unit that the truck was traveling at 75 m.p.h., the posted speed limit. *Id*. The officer observed the truck "traveling only two to three car lengths behind a 'PT Cruiser type' vehicle." *Id*. Based on this observation, the officer determined that the truck was following the other vehicle too closely in violation of NM ST Section 66-7-318. *Id*. The officer "turned around in the median and drove eastbound at approximately 110 to 115 m.p.h. to catch up to the truck." *Id*. at *2. The patrol vehicle's recording equipment began recording as the patrol vehicle approached the truck. *Id*. When the officer caught up to the truck, the truck had moved over into the right lane, still following the PT Cruiser type vehicle. *Id*. The officer engaged his emergency lights and the truck pulled over. *Id*.

The defendant argued that the stop was not justified because the officer lacked reasonable suspicion that he had violated NM ST Section 66-7-318. *Id*. at *6. Specifically, the defendant asserted that "he was not following the other vehicle more closely than is reasonable and prudent under the clear, dry weather conditions and the light traffic at the time." *Id*. The defendant contended that "the statute allows a driver

flexibility to judge what should be a safe following distance" and argued that "the video reveals that he was not following at an unsafe distance." *Id*. The prosecution argued that the stop was based on the officer's "observation before he turned around and before the video recorder began recording." *Id*. at *7. The prosecution asserted that the officer "credibly testified that when he was traveling westbound, he saw the pickup truck traveling eastbound at 75 mph and following only tow to three car lengths behind a 'PT Cruiser' type vehicle." *Id*. The district court determined that:

> After considering [the defendant's] arguments and reviewing the record, including [the officer's] testimony, the [c]ourt finds that [the defendant] has failed to negate [the officer's] testimony that he observed the violation before he turned around and before the video equipment was engaged. [The officer] credibly testified that he observed [the defendant] and the vehicle in front of him driving 75 mph with approximately two to three car lengths between the vehicles. Based on the evidence, the [c]ourt concludes that [the officer] had sufficient reasonable suspicion that [the defendant] had violated NM S[T Section] 66-7-318(A), and the stop was justified.

*Id*. at *8.

Here, while positioned in a center median, Officer Jackson observed Defendant's vehicle approaching his position and noted that Defendant's vehicle was traveling directly behind a CMV at a distance of one and one-half car lengths. Further, as Defendant's vehicle passed Officer Jackson, it maintained the distance of one and one-half car lengths behind the CMV. (Jackson Hr'g Test. at 11-13; Gov. Exhibit 2.) Based on his observation of one and one-half car lengths between Defendant's vehicle and the CMV, Officer Jackson determined that Defendant's vehicle was following too closely to the CMV in violation of NM ST Section 66-7-318 and decided to stop Defendant's vehicle. (*Id*. at 18-19; Gov. Exhibit 2.) In his testimony, Officer Jackson discussed a guide used by New Mexico law enforcement officers which provides that vehicles traveling 65 miles per hour should have 95 feet distance between vehicles and vehicles traveling 75 miles

per hour should have 110 feet distance between vehicles. Officer Jackson stated that at either 65 miles per hour or 75 miles per hour, Defendant's vehicle was closer to the CMV than the recommended distance in the guide. (*Id.* at 13-15, 18-19; Gov. Exhibit 7.) Additionally, while catching up to Defendant's vehicle, before his emergency lights were activated, Officer Jackson observed that Defendant's vehicle continued to follow the CMV too closely, at a distance of 50 to 60 feet. Continuing to follow the CMV, Defendant's vehicle began to pass a freight truck but noticing Officer Jackson, the driver of Defendant's vehicle abruptly slowed down and moved to the right behind the freight truck, also at an unsafe distance. (*Id.* at 21-22.) Officer Jackson also testified that, even without contact from law enforcement in Iowa, he would have conducted the stop of Defendant's vehicle based on Defendant's vehicle traveling too closely to the CMV. (*Id.* at 19.)

I find Officer Jackson's testimony to be credible. Moreover, I find that Officer Jackson credibly testified that he observed Defendant's vehicle driving between 65 miles per hour and 75 miles per hour with approximately one and one-half car lengths between Defendant's vehicle and the CMV. Like in *Diaz-Gomez*, I find that Defendant has failed to negate Officer Jackson's testimony that he observed the violation before he left the center median and before his patrol vehicle's video equipment was engaged. Thus, I find that Officer Jackson had probable cause to stop Defendant's vehicle for violating NM ST Section 66-7-318.

Defendant raises multiple arguments with regard to the traffic stop, all lacking merit, which I will address in turn. First, relying on *State v. Sanchez*, No. 34,170, 2016 WL 1546619 (N.M. Ct. App. Mar. 2, 2016), Defendant implies that the distance a driver follows a vehicle is at the driver's discretion. Defendant contends that, given the favorable road conditions and the "wide discretion that New Mexico drivers enjoy," there was no traffic violation. (Doc. 128-1 at 4-5.) While *Sanchez* acknowledges that a

27

Case 1:22-cr-00091-CJW-MAR     Document 183     Filed 06/08/23     Page 27 of 42

measure of flexibility is required depending on road conditions for determining whether a vehicle is following too closely under NM ST Section 66-7-318, *Sanchez* does not support the proposition that the discretion of a driver trumps the determination of a law enforcement officer that an individual is following too closely.  2016 WL 1546619, at *3-*4.

Second, Officer Jackson is employed by the United States Department of Interior, Bureau of Indian Affairs, Division of Drug Enforcement, K-9 Unit, in the South Region and assigned to the United States Homeland Security Investigations, Criminal Interdiction Unit.  Contrary to Defendant's assertion that such officers "are not in the business of traffic law enforcement," *see* Doc. 128-1 at 5, Officer Jackson's job is to conduct high-volume traffic stops in multiple states, including Arizona, New Mexico, Colorado, Utah, and Nevada.  (Jackson Hr'g Test. at 5-7.)  While this might not be the first duty of Homeland Security officers that springs to mind, Officer Jackson testified that his job duties include "looking for motor vehicle infractions that are more or less like just speeding, following too close, things that would contribute to accidents."  (*Id.* at 11.)  Further, Officer Jackson testified that he regularly stops vehicles multiple times per day for following too closely.  (*Id.* at 18.)

Third, Defendant points out that the only video in the record of Officer Jackson's pursuit of Defendant's vehicle, Government Exhibit 3, is video of Officer Jackson's pursuit after Defendant's vehicle passed him while he was parked in the median.  (Doc. 151 at 4.)  Thus, Defendant complains that there is no video of Defendant's vehicle following the CMV when it passed Officer Jackson's patrol car when it was stationed in the median.  However, Officer Jackson explained that the dash camera in his patrol car is not activated until the vehicle's emergency lights are activated.  Officer Jackson stated that, for safety purposes and to avoid causing an accident, he does not activate his emergency lights while in a median.  Officer Jackson also stated that he does not activate

28

his emergency lights until he is close to a vehicle he intends to pull over because it makes it less likely that the vehicle being pursued will take off at a high rate of speed. (Jackson Hr'g Test. at 44-45.) I find Officer Jackson's testimony and reasoning credible regarding the timing of the dash camera video.

Fourth, as to the video contained in Government Exhibit 3, Defendant and Officer Jackson offer differing interpretations of what can be seen from the dashboard camera video. Defendant argues that the video does not show his vehicle following the CMV too closely. (Doc. 151 at 3-5.) Officer Jackson, on the other hand, testified that the video does show Defendant's vehicle following both the CMV and the box truck at unsafe distances. (Jackson Hr'g Test. at 45-48.) I have reviewed Government Exhibit 3 and find that, principally because Officer Jackson's vehicle is approaching from the rear, it is somewhat difficult to estimate the distance between the vehicles. However, at :40 of Exhibit 3, Defendant's vehicle appears unreasonably close to the CMV when it ducks behind the CMV as Officer Jackson is approaching. Nevertheless, the dash camera video does not undermine Officer Jackson's credibility and does not call into question his testimony that, when Defendant's vehicle passed him while he was positioned in the center median, Defendant's vehicle was following the CMV too closely. As the Eighth Circuit has said:

> But nothing in the video footage undermines this testimony. *See United States v. Harper*, 787 F.3d 910, 914 (8th Cir. 2015) ("[T]he 'decision to credit a witness's testimony over that of another can almost never be a clear error unless there is extrinsic evidence that contradicts the witness's story or the story is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it.'" (quoting *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995))). Rather, the cameras were simply not aimed in a direction to capture the trooper's observations, and the video footage "neither confirms nor refutes" Trooper Otterson's assertions. *United States v. Briasco*, 640 F.3d 857, 860 (8th Cir. 2011). "Credibility assessments are 'the province of the trial court,'" *Harper*, 787 F.3d at 914 (quoting *Heath*, 58 F.3d at 1275), and "[a] credibility

> determination made by a district court after a hearing on the merits of a motion to suppress is virtually unassailable on appeal," *United States v. Morris*, 915 F.3d 552, 555 (8th Cir. 2019) (quoting *United States v. Frencher*, 503 F.3d 701, 701 (8th Cir. 2007)). The district court credited the trooper's testimony, and we find no clear error in this credibility finding.

*United States v. Stewart*, 32 F. 4th 691, 694 (8th Cir. 2022). Here the video tends to support Officer Jackson's testimony, but it certainly does not contradict it. Thus, I have no difficulty crediting his testimony regarding the distance between the vehicles.

Fifth, Defendant argues that Officer Jackson's knowledge that a CS informed Cedar Rapids law enforcement officers that Defendant's car may contain drugs incentivized Officer Jackson to pull Defendant's vehicle over. (Doc. 173 at 7.) Specifically, Defendant argues that:

> Given [Officer] Jackson's incentive to stop the [D]efendant because he had been told there might be drugs in the car, the convenient absence of video evidence is suspicious. Officer Jackson's testimony that he was able to estimate the distance between vehicles during the few seconds that he observed the [D]efendant's car from his vantage point on the median is unlikely on its face.

*Id*. Defendant's argument is speculation. Defendant offers no evidence to dispute Officer Jackson's credible testimony that he observed Defendant's vehicle following the CMV too closely from his vantage point in the center median. As discussed above, Officer Jackson gave a credible explanation of why no video exists from his vantage point in the median. Lastly, Officer Jackson credibly testified that, even without contact from law enforcement in Iowa, he would have conducted the stop of Defendant's vehicle based on Defendant's vehicle traveling too closely to the CMV. (Jackson Hr'g Test. at 19.)

Accordingly, based on all of the foregoing, I find that Officer Jackson had probable cause to stop Defendant's vehicle for violating NM ST Section 66-7-318.

In addition to probable cause to stop Defendant's vehicle for violating NM ST Section 66-7-318, Officer Jackson also had reasonable suspicion to conduct an investigatory *Terry* stop of Defendant's vehicle based on the information provided by the CS to law enforcement in Cedar Rapids, and which was relayed to Officer Jackson. Specifically, on September 30, 2022, Inspector Husak and Special Agent Hoch interviewed the CS in Cedar Rapids. The CS told Inspector Husak and Special Agent Hoch that, days prior to the interview, Defendant came to the CS's residence and told the CS that he was traveling to Phoenix to pick up methamphetamine to bring back to Cedar Rapids. The CS also told Inspector Husak and Special Agent Hoch that, when Defendant left his residence, Defendant was leaving directly for Phoenix. The CS also stated that Defendant drove a white Chevrolet sedan. Additionally, in a separate conversation, a couple days prior to the September 30, 2022 interview, the CS told law enforcement that, in 2021 the CS and Defendant sourced methamphetamine for each other. The CS also generally knew where Defendant lived off Blairs Ferry Road in Cedar Rapids.

Law enforcement was able to corroborate the information provided by the CS. Law enforcement was familiar with Defendant's residence because in November 2021, investigators had executed a search warrant at Defendant's residence, which was off Blairs Ferry Road. Similarly, while Defendant was under investigation for his involvement in the drug distribution conspiracy, during surveillance of Defendant, investigators observed Defendant driving a white Chevrolet sedan. A records check of Defendant's license plate, Iowa JPT331, revealed a recent change in plates and registration to Iowa license plate LQJ205 registered to ANC Transportation. Investigators knew that ANC Transportation belonged to Defendant based on records found during the search of Defendant's residence and records found at ANC Transportation's business address which also had been searched pursuant to a warrant.

Finally, investigators ran the Defendant's new license plate through the LPR system which showed that the plate had been recorded driving east on Interstate 40 in New Mexico, a few minutes prior to running the plate through the LPR system. Investigators noted that traveling eastbound through New Mexico is consistent with the route one would take to return to Cedar Rapids from Phoenix. (*See generally* Husak Hr'g Test. At 78-86; Gov. Exhibit 1.)

Investigator Husak passed the above-referenced information on to Officer Jackson. Upon receiving this information, Officer Jackson performed his own LPR search on Defendant's vehicle. The search showed that Defendant's vehicle had entered New Mexico at 10:15 a.m. (MST) and was traveling eastbound on Interstate 40. Because of his location, Officer Jackson was certain that Defendant's vehicle would pass his location on Interstate 40 in approximately one hour. (Jackson Hr'g Test. at 8-10.)

In considering the *Navarette* and *Manes* factors for determining an informant's reliability, I find that the CS's information in this case was sufficiently reliable. First, the CS's information was based on direct information from Defendant, who visited the CS at the CS's residence and told the CS he was traveling to Phoenix to pick up methamphetamine. *See Navarette*, 527 U.S. at 399. Second, the CS gave accurate information regarding the vehicle Defendant drove and where Defendant was traveling. The CS also knew the location of Defendant's residence and in the past had engaged with Defendant in sourcing methamphetamine. *See id*. at 398; *Manes,* 603 F.3d at 456. Third, the CS stated that Defendant was transporting methamphetamine from Phoenix to Cedar Rapids and law enforcement was already investigating Defendant for a drug distribution conspiracy. *See Navarette,* 572 U.S. at 398. Fourth, while the CS had a limited track record of providing reliable information, he was not an anonymous tipster and therefore had a greater level of reliability than an anonymous tipster. *See Manes,* 603 F.3d at 456; *see also Kent*, 531 F.3d at 649 ("Though less reliable than informants with a proven

record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information."). Fifth, law enforcement independently corroborated much of the information provided by the CS. The CS's description of Defendant's vehicle and residence were consistent with information investigators had obtained about Defendant's vehicle and residence through their investigation of Defendant. A records check of Defendant's vehicle showed that the vehicle had recently been re-registered to a business owned by Defendant. Investigators also ran Defendant's license plate through the LPR system which showed that, on the date of the interview and traffic stop, Defendant's vehicle was traveling through New Mexico, which was consistent with traveling from Phoenix to Cedar Rapids. *See Manes*, 603 F.3d at 456; *Navarette,* 572 U.S. at 398. Sixth, the CS provided the information to law enforcement only hours prior to Defendant's stop and arrest. *See Navarette*, 572 U.S. at 398-400.

Based on the foregoing, I find that the information provided by the CS had sufficient indicia of reliability and was sufficiently corroborated by law enforcement. *See Bell*, 480 F.3d at 863; *Manes,* 603 F.3d at 456. To the extent Defendant relies on *United States v. Kennedy*, 427 F.3d 1136 (8th Cir. 2005) to support his contention that the CS was not reliable, Defendant's reliance is misplaced. In *Kennedy*, the defendant's ex-girlfriend, reported to law enforcement that the defendant had entered her residence, taken her safe, and was driving a black vehicle. *Id*. at 1139. A police officer observed the defendant's vehicle, which matched the description provided by his ex-girlfriend, stopped the vehicle and ultimately arrested the defendant for driving without a license. *Id*. With the defendant in the back of his police car, the officer went to the ex-girlfriend's home to interview her regarding the earlier altercation with the defendant. *Id*. During their conversation, the ex-girlfriend told the officer that the defendant deals methamphetamine and keeps it under a loose speaker in the trunk of his car. *Id*. The officer returned to the defendant's vehicle, which was being prepared for towing, and

33

lifted the speakers in the trunk and found two large packages of methamphetamine and $6,000 in cash. *Id*. at 1140. The district court, affirmed by the Eighth Circuit, determined that the police officer lacked probable cause to search the defendant's vehicle because he did not ascertain the recency of the information provided by the ex-girlfriend. *Id*. Specifically, the Eighth Circuit determined that the information provided by the ex-girlfriend was "information of an unknown and undetermined vintage relaying the location of mobile, easily concealed, readily consumable, and highly incriminating narcotics [which] could quickly go stale in the absence of information indicating an ongoing and continuing narcotics operation." *Id*. at 1142.

The instant case is easily distinguishable from *Kennedy*. Significantly, *Kennedy* involved an ex-girlfriend, not a CS. Moreover, the police officer in *Kennedy* relied solely on the information provided by the ex-girlfriend as probable cause to search the defendant's vehicle. Here, the information from the CS gave Officer Jackson reasonable suspicion to conduct a *Terry* stop of Defendant's vehicle. The timing of the CS's meeting with Defendant—that Defendant told the CS a couple days prior that he was traveling to Phoenix to pick up methamphetamine to bring back to Cedar Rapids—and the LPR hit about an hour before Defendant was stopped, which showed Defendant traveling in New Mexico, a route consistent with returning to Cedar Rapids from Phoenix, does not raise the recency concerns found in *Kennedy*. Accordingly, I find that the reliability of the CS's information and corroboration by law enforcement is consistent with *Navarette* and *Manes* and supported law enforcement's reasonable suspicion to conduct a valid *Terry* stop on Defendant. *See Bell*, 480 F.3d at 863 ("Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated.") (Citing *Adams*, 407 U.S. at 147; *Jacobsen*, 391 F.3d at 906).

Defendant also raises questions principally about the CS's motive and honesty. In assessing an informant's motives, the United States Supreme Court has stated, "even if

we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." *Illinois v. Gates*, 462 U.S. 213, 234 (1983). "When an informant's information is at least partly corroborated . . . 'attacks upon credibility and reliability are not crucial to the finding of probable cause.'" *United States v. Gladney*, 48 F.3d 309, 313 (8th Cir.1995) (quoting *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir.1992)). Here, the information was sufficiently corroborated to justify a *Terry* stop, despite any questions that might have arisen regarding the CS's motive or honesty in providing information about Defendant to law enforcement.

The traffic stop was not unconstitutionally prolonged. This case is factually similar to *United States v. Fuehrer*, 844 F.3d 767 (8th Cir. 2016). In *Fuehrer*, the defendant's vehicle was stopped for speeding. *Id*. at 770. The traffic stop involved the following pertinent facts:

> During the traffic stop, [the defendant] was unable to provide a license. Deputy Williams asked [the defendant] to sit in the patrol car while he completed paperwork for the traffic violation. During this time, a second deputy, Deputy Kearney, arrived with a trained narcotics canine. Deputy Kearney conducted an open-air sniff of [the defendant's] vehicle and the canine alerted to the presence of narcotics. After the dog-sniff search was complete, Deputy Williams finished the tasks related to the traffic stop and wrote [the defendant] a warning for the traffic violation. Deputies Williams and Kearney then informed [the defendant] that the canine had alerted to the presence of narcotics, and Deputy Williams gave [the defendant] his *Miranda* warnings. Officers searched the vehicle and found 26.09 grams of methamphetamine.

*Id*. at 770-71. The defendant argued that he was "unconstitutionally detained while officers executed the dog sniff." *Id*. at 772. The Eighth Circuit determined that the dog sniff did not unconstitutionally prolong the traffic stop:

In this case, Deputy Kearney arrived within two minutes of Deputy Williams initiating the traffic stop. Because [the defendant] did not have a license, Deputy Williams asked [the defendant] to sit in the patrol car while he completed paperwork. Deputy Kearney conducted the dog sniff while [the defendant] was in the patrol car. Deputy Williams completed the tasks related to the traffic stop and wrote [the defendant] a warning after the dog sniff was complete and the dog had alerted to the presence of narcotics. Thus, there is no evidence that the dog sniff unlawfully prolonged the traffic stop beyond what was necessary to complete the stop.

*Id.* at 773.

Here, Deputy Armijo was stationed with Officer Jackson in another patrol vehicle in the median on Interstate 40, followed Officer Jackson, and was immediately on the scene when Defendant's vehicle was pulled over. After Officer Jackson advised Mercadel that he would be issuing him a warning for following too closely and instructed Mercadel to exit the vehicle and accompany him to his patrol car, Deputy Armijo spoke with the passengers and asked Collins and Defendant to exit the vehicle because he intended to deploy his dog around the exterior of the vehicle. After Collins and Defendant exited the vehicle, Deputy Armijo deployed his dog around the exterior of the vehicle. Deputy Armijo deployed his dog while Officer Jackson was performing the records check and writing the warning citation. Deputy Armijo finished the dog sniff of the vehicle before Officer Jackson finished writing the citation. (*See generally id.* at 22-34.) Government Exhibits 4 (Officer Jackson's dash camera video) and 5 (Deputy Armijo's body camera video) are consistent with Officer Jackson's testimony and demonstrate that Deputy Armijo finished the dog sniff around the exterior of Defendant's vehicle prior to Officer Jackson completing the citation. Based on the foregoing, I find that neither Officer Jackson's performance of a records check and writing Mercadel a warning citation nor Deputy Armijo's dog sniff unnecessarily prolonged the traffic stop.

36

Defendant's argument that "[i]nstead of writing the warning . . . Officer Jackson interrogated the driver about his itinerary and questioned him about his purpose for traveling to Iowa" wholly lacks merit.  (Doc. 128-1 at 6.)  First, Officer Jackson's dash camera video (Gov. Exhibit 4) does not support Defendant's contention that Officer Jackson prolonged the search by asking Mercadel about his travels.  Government Exhibit 4 shows that Officer Jackson was simply being conversational while running the records checks and writing the citation.  In his testimony, Officer Jackson stated that he always conducts his "traffic stops systematically, and I always conduct a record check on the individual [and] make sure that they have no warrants, valid license, I check the vehicle registration, and confirm the insurance before I begin my enforcement action as far as a warning or citation[.]"  (Jackson Hr'g Test. at 27.)  Officer Jackson also acknowledged that he had a general conversation with Mercadel regarding his travels.  Officer Jackson stated "I ask everyone about their travels, if they're willing to communicate with me. It's not mandatory, that they talk to me, but if they do decide to talk to me, I engage." (*Id.* at 28.)  "[T]ravel-related questions do not impermissibly prolong a traffic stop when the officer is still completing the matter for which the stop was made."  *United States v. Rutledge*, 61 F.4th 597, 603 (8th Cir. 2023) (citing *United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021)).

Defendant's reliance on *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008) is also misplaced.  In *Peralez*, the Eighth Circuit determined that "[t]he stop was delayed because of the trooper's drug interdiction questioning, not because of anything related to the investigation or processing the traffic violation."  *Id.* at 1120.  Defendant makes no argument and points to no evidence which suggests that Officer Jackson prolonged the traffic stop due to "drug interdiction questioning."  Accordingly, I find that the traffic stop was not unconstitutionally prolonged.

Because the dog sniff did not prolong the stop and Deputy Armijo's dog alerted on Defendant's vehicle for narcotics, Officer Jackson and Deputy Armijo had probable cause to search the vehicle. Defendant notes that Deputy Armijo's dog is trained to detect four types of drugs—marijuana, cocaine, heroin, and methamphetamine—but could not indicate to law enforcement which drug he detected. (Doc. 173 at 2.) Defendant also notes that when Mercadel was informed that the dog had alerted on the car, Mercadel told Officer Jackson and Deputy Armijo that he had personal use amount of marijuana in his luggage located in the trunk of the car. (*Id.*) Defendant points out that, under New Mexico law, an individual may legally possess up to two ounces of marijuana. (*Id.*) Thus, Defendant maintains that "up to six ounces of marijuana could have been legally possessed within . . . [D]efendant's vehicle." (*Id.*) Defendant contends that "[b]ecaue the K-9 alerted on . . . [D]efendant's vehicle and officer could not tell whether the alert was for marijuana, probable cause did not exist." (*Id.* at 3.)

Defendant's argument is flawed because under federal law—which applies in this case—marijuana remains a controlled substance. *See Gonzalez v. Raich*, 545 U.S. 1, 27 (2005) (providing that "[t]he [Controlled Substances Act] designates marijuana as contraband for *any* purpose") (emphasis in original). In *United States v. Spikes*, No. 19-cr-264-WJM, 2021 WL 1853419 (D. Colo. May 10, 2021), the district court addressed the implications of Colorado's legalization of marijuana on a dog sniff under federal law. The district court explained that:

> It is well-established that federal law—not state law—governs the admissibility of evidence in a federal criminal prosecution. For example, in *California v. Greenwood*, the Supreme Court recognized that garbage left outside the home for collection was not entitled to Fourth Amendment protection when searched by state officers, even though the California Supreme Court had previously announced a right to privacy to such garbage. 486 U.S. 35, 43 (1988). As the Supreme Court recognized,

> [i]ndividual States may surely construe their own constitutions
> as imposing more stringent constraints on police conduct than
> does the Federal Constitution. We have never intimated,
> however, that whether or not a search is reasonable within the
> meaning of the Fourth Amendment depends on the law of the
> particular State in which the search occurs. We have emphasized
> instead that the Fourth Amendment analysis must turn on such
> factors as "our societal understanding that certain areas deserve
> the most scrupulous protection from government invasion." We
> have already concluded that society as a whole possesses no such
> understanding with regard to garbage left for collection at the
> side of a public street. Respondent's argument is no less than a
> suggestion that concepts of privacy under the laws of each State
> are to determine the reach of the Fourth Amendment. We do
> not accept this submission.

*Id.* at 43–44 (internal citations omitted).

> The same principle applies here. Just as Fourth Amendment analysis does
> not turn on California's recognition of a right to privacy in garbage, nor
> can it turn on Colorado's recognition of an expectation of privacy in the
> lawful activity of possessing marijuana. *See also United States v. Hayes*,
> 2020 WL 4034309, at *20 (E.D. Tenn. Feb. 21, 2020) (rejecting argument
> that state legalization of hemp eliminates probable cause gained by drug
> detection dog's alert under federal law); *United States v. Hicks*, 722 F.
> Supp. 2d 829, 833 (E.D. Mich. 2010) (holding that "[i]t is indisputable that
> state medical-marijuana laws do not, and cannot, supersede federal laws
> that criminalize the possession of marijuana").

*Spikes*, 2021 WL 1853419, at *7-*8. Thus, the district court concluded that the dog sniff did not violate the defendant's Fourth Amendment rights. *Id*. at *8.

Here, like in *Spikes*, because federal law controls, Deputy Armijo's deployment of his dog around the exterior of Defendant's car did not violate the Fourth Amendment. *See United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (holding that a dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment). Further, "an alert or indication by a properly trained and reliable drug

dog provides probable cause . . . for the search of a vehicle." *United States v. Rederick*, 65 F.4th 961, 967 (8th Cir. 2023) (quoting *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010)).[7] Because marijuana is an illegal controlled substance under federal law and Deputy Armijo's dog alerted on Defendant's vehicle—whether for marijuana or methamphetamine—Officer Jackson and Deputy Armijo had probable cause to search Defendant's vehicle.

## D.     *Summary of Recommendations*

In summary, based on the totality of the circumstances, I find that Officer Jackson had probable cause to stop Defendant's vehicle after observing it following a CMV too closely in violation of NM ST Section 66-7-318. Even if the traffic violation did not create probable cause to believe a traffic violation occurred—which it did—I find that Officer Jackson had reasonable suspicion to conduct a *Terry* stop on Defendant's vehicle based on the information about the suspected drug trafficking crime received from Iowa. Furthermore, if the Court does not conclude that Officer Jackson had separate and independent grounds for the stop, it should address these circumstances under the collective knowledge doctrine. Here, the Court may not need to reach the issue of collective knowledge if it concludes, as I recommend, that Officer Jackson had a particularized and objective basis to search from his own observations. *See United States. v. Gaston*, 22-CR-44-CJW-MAR, 2023 WL 3147902, at *8 (N.D. Iowa Apr. 28, 2023) (the Court need not reach the issue of collective knowledge where the officer effectuating the search had a particularized and objective basis for it.)

---

[7] Defendant does not question Deputy Armijo's dog's training or reliability. At the hearing, Officer Jackson testified that with regard to Deputy Armijo's dog, "I would say between himself, myself and the New Mexico State Police, we all train and certify together at the same time," indicating that Deputy Armijo's dog was properly trained and certified. (Jackson Hr'g Test. at 75.) Officer Jackson also stated that "[a]ny dog that is not certified we do not allow out on the team." (*Id.*)

The collective knowledge doctrine is applicable to Officer Jackson's reasonable suspicion to conduct a *Terry* stop based on the CS's corroborated information regardless of whether Officer Jackson intended to rely on the information and regardless of the validity of his asserted reason for the stop, i.e., following too closely. The collective knowledge doctrine provides that "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)). Defendant correctly points out that, in his hearing testimony, Inspector Husak stated that based on the CS's information, Officer Jackson did not have probable cause to stop Defendant's vehicle. (Husak Hr'g Test. At 101.) However, the issue is not whether Officer Jackson had probable cause to stop Defendant's vehicle but whether he had reasonable suspicion to make a *Terry* stop and the reasonable suspicion standard "is 'less demanding' than probable cause and much lower than preponderance of the evidence." *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021). Here, arguably Inspector Husak and Officer Jackson would not constitute a typical investigative team. Inspector Husak told Officer Jackson that the CS's information was not "cause alone to do any enforcement action" (Husak Hr'g Test. at 87), and Officer Jackson stated that he made his own probable cause determination to stop Defendant's vehicle based on the traffic violation alone. Nevertheless, the fact remains that Inspector Husak communicated the information gathered from the CS to Officer Jackson and the information communicated, as discussed above, was sufficient to justify a *Terry* stop on Defendant's vehicle. I also find that the traffic stop in this matter was not unconstitutionally prolonged. Lastly, I find that Deputy Armijo's dog alerting for the presence of drugs on Defendant's vehicle

41

gave Officer Jackson and Deputy Armijo probable cause to search Defendant's vehicle. Therefore, I recommend that Defendant's motion be denied.

## VI.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress.  **(Doc. 128.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Crim. P. 59.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir.  2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 8th day of June, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa