**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-CR-91 CJW-MAR |
| Plaintiff, | **ORDER** |
| vs. | |
| CALVIN WILLIAMS, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................... 2

II.  STANDARD OF REVIEW.................................................................... 2

III.  FACTUAL BACKGROUND ................................................................ 3

IV.  ANALYSIS........................................................................................ 8

    A.  Stipulated Discovery Order......................................................... 9

    B.  Traffic Violation ......................................................................12

    C.  CS' Tip ....................................................................................16

    D.  Prolonged Stop ........................................................................18

    E.  K-9 Sniff..................................................................................20

    F.  Collective Knowledge Doctrine.................................................23

V.  CONCLUSION ................................................................................24

# I.    INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress, in which defendant requested a hearing.  (Doc. 128).  The government timely filed a resistance (Doc. 136), and defendant timely filed a reply (Doc. 151).   The Court referred defendant's motion to the Honorable Mark A. Roberts, United States Magistrate Judge, for Report and Recommendation ("R&R").  On May 4, 2023, Judge Roberts held a hearing on the motion.  (Doc. 153).  Afterwards, both the government and defendant submitted supplemental briefing.  (Docs. 172 & 173).  On June 8, 2023, Judge Roberts recommended that the Court deny defendant's motion to suppress.   (Doc. 183). Defendant objected to Judge Roberts' R&R.  (Doc. 186).  For the following reasons, the Court **overrules** defendant's objections, **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

# II.    STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

## III. FACTUAL BACKGROUND[1]

On September 30, 2022, Inspector Husak and DEA Special Agent Jacob Hoch interviewed a Confidential Source ("CS") at the DEA Office in Cedar Rapids, Iowa. (Husak Hr'g Test. at 78, Gov. Exhibit 1.) The CS told Inspector Husak and Special Agent Hoch that, days prior to the interview, Defendant came to the CS's house inquiring whether the CS wanted to advance money towards methamphetamine that Defendant was driving to Phoenix, Arizona to pick up and bring back to Cedar Rapids. The CS did not request or advance any money toward the methamphetamine being picked up in Arizona. (*Id.* at 78-79; Gov. Exhibit 1.) The CS also told Inspector Husak and Special Agent Hoch that Defendant was driving a white Chevrolet sedan and that the CS understood that Defendant was leaving directly for Phoenix from the CS's house. (*Id.* at 79; Gov. Exhibit 1.)

Inspector Husak noted that law enforcement had spoken with the CS a couple days prior to the September 30, 2022 interview and prior to that in the late 1990s. (*Id.* at 80.) In the conversation prior to September 30, 2022, the CS told law enforcement that in 2021 the CS and Defendant had an arrangement where they sourced methamphetamine to each other depending on the cost, sourcing, and quantity available to each of them. (*Id.*) The CS also told law enforcement that he knew Defendant lived off Blairs Ferry Road in Cedar Rapids. (*Id.*)

---

[1] After reviewing the hearing transcript (Doc. 39), the Court finds that Judge Roberts accurately and thoroughly set forth the relevant facts in the R&R. The Court adopts Judge Roberts' summary of the facts here, including footnotes. When relevant, the Court relies on and discusses additional facts in conjunction with its legal analysis.

The CS's information regarding the type of car Defendant drove and where he lived was consistent with information investigators already knew. Specifically, investigators were aware that Defendant lived off Blairs Ferry Road because, in November 2021, investigators had executed a search warrant at Defendant's residence, which was located off Blairs Ferry Road. (*Id.* at 81.) Investigators were also aware of the type of vehicle Defendant drove. As part of the investigation into the drug distribution conspiracy involving Defendant, investigators had observed Defendant in a white Chevrolet sedan with Iowa license plate JPT331. (*Id.* at 81-82.)

On September 30, 2022, after the interview with the CS, investigators ran a records check on Defendant's vehicle. The records check revealed that the license plate and registration on Defendant's vehicle had recently been changed to Iowa license plate LQJ205 and the vehicle was registered to ANC Transportation, a known business of Defendant. (*Id.* at 82-83; Gov. Exhibits 1 & 9.) Investigators knew that ANC Transportation belonged to Defendant based on records found during the search of Defendant's residence and records found at the business address which also had been searched pursuant to a warrant. (*Id.* at 84-85.) Investigators also ran the Defendant's license plate (Iowa LQJ205) through the License Plate Reader ("LPR") system which revealed that the plate had been recorded driving east on Interstate 40 in New Mexico, a few minutes prior to running the plate through the LPR system. (*Id.* at 85-86; Gov. Exhibits 1 & 10.) Inspector Husak noted that traveling eastbound through New Mexico is consistent with the route one would take to return to Cedar Rapids from Phoenix. (*Id.* at 86; Gov. Exhibit 1.)

Inspector Husak contacted Officer Jackson, who was working in New Mexico, and generally described the investigation of Defendant in Iowa to him. Inspector Husak also told Officer Jackson that, based on information from a CS, Iowa law enforcement believed that Defendant was traveling from Cedar Rapids to Phoenix to pick up an unspecified amount of methamphetamine to bring back to Cedar Rapids at an unknown time. Inspector Husak told Officer Jackson that there was a recent LPR hit in New Mexico, and it appeared Defendant was traveling back to Cedar Rapids. Additionally, Inspector Husak told Officer Jackson that the information shared from the CS was only for information purposes and any decision for enforcement would be Officer Jackson's own decision to make and would be separate from the investigation in Iowa. (*Id.* at 87; Gov. Exhibit 1.)

4

On September 30, 2022, after speaking with Inspector Husak, Officer Jackson performed his own LPR search on Defendant's vehicle. The search showed that Defendant's vehicle had entered New Mexico at 10:15 a.m. (MST) and was traveling eastbound on Interstate 40. Based on Officer Jackson's location on Interstate 40, he was certain that Defendant's vehicle would pass his location in approximately one hour. (Jackson Hr'g Test. at 8-10.) Specifically, Officer Jackson was in his patrol car, which was parked in the center median perpendicularly to the traffic lanes such that traffic in the eastbound lane on Interstate 40 would pass in front of his vehicle. (*Id*. at 11.)

At approximately 11:36 a.m., Officer Jackson observed Defendant's vehicle approaching his position. Officer Jackson noted that as Defendant's vehicle approached him, the vehicle's speed reduced and was traveling directly behind a commercial motor vehicle ("CMV") at a distance of one and one-half car lengths. As Defendant's vehicle passed Officer Jackson, it maintained the distance of one and one-half car lengths behind the CMV. (*Id*. at 11-13; Gov. Exhibit 2.) In a guide used by New Mexico law enforcement officers, vehicles traveling 65 miles per hour should have 95 feet distance between them and vehicles traveling 75 miles per hour should have 110 feet distance between them. (*Id*. at 13; Gov. Exhibit 7.) Officer Jackson testified that keeping the proper distance between vehicles promotes safety and avoids accidents. (*Id*. at 15.) Further, Officer Jackson noted that at the distance Defendant's vehicle was traveling behind the CMV, the driver of the CMV would not have been able to see Defendant's vehicle, creating an additional safety risk. (*Id*. at 17-18.) Based on his observation of one and one-half car lengths between Defendant's vehicle and the CMV, Officer Jackson determined that Defendant's vehicle was following too closely to the CMV in violation of New Mexico law, and Officer Jackson decided to stop Defendant's vehicle. (*Id*. at 18-19; Gov. Exhibit 2.)

After other traffic on Interstate 40 passed, Officer Jackson left the center median to catch up to Defendant's vehicle and conduct a traffic stop. (*Id*. at 19.) Officer Jackson testified that, even without contact from law enforcement in Iowa, he would have conducted the stop of Defendant's vehicle based on Defendant's vehicle traveling too closely to the CMV. (*Id*. at 19.) Officer Jackson explained that:

> we stop vehicles mainly that contribute to safety infractions on our roadways, and I conduct high-volume stops every day that I go out, so this would have been a vehicle that I probably

5

would have been of interest in. And furthermore, I would consider this type of driving, with my training, to be driving behavior associated with my presence in a center median in a fully marked vehicle when I'm out conducting criminal patrol. So typically in our area when people see us, they'll slow down, but after they have passed, they pick back up and they continue on what they were initially doing. In this particular case, this vehicle, when I—it first came into sight, maintained its distance behind the commercial motor vehicle as it passed me, and then after it passed me, the same. The vehicle never went around the tractor trailer, and it basically just continued to follow. So for me, as far as driving behavior is concerned and working criminal interdiction, this vehicle, in conjunction with the underlying violation for following too close, would have drawn my attention.

(*Id.* at 20.) As Officer Jackson drove to catch up to Defendant's vehicle, his emergency lights were not activated and he observed that Defendant's vehicle continued to follow too closely to the CMV, at a distance of 50 to 60 feet. Still following the CMV, Defendant's vehicle began to pass a freight truck but, after noticing Officer Jackson approaching, the driver of Defendant's vehicle abruptly slowed down and moved to the right behind the freight truck, also at an unsafe distance. (*Id.* at 21-22.)

At this point, Officer Jackson activated the emergency lights on his patrol vehicle and moved from the left lane into the right lane behind Defendant's vehicle. Defendant's vehicle pulled over to the side of the road. Additionally, at the time Officer Jackson initiated his pursuit of Defendant's vehicle, Cibola County Sheriff's Office Deputy Julian Armijo had been stationed with Officer Jackson in another patrol vehicle in the median on Interstate 40. Deputy Armijo left his position in the median directly behind Officer Jackson and assisted in the stop of Defendant's vehicle. (*Id.* at 22-23.)

Officer Jackson approached the rear passenger side of Defendant's vehicle. Officer Jackson tapped on the rear passenger window and noted three individuals in the vehicle. The driver was Troy Mercadel. James Collins was in the front passenger seat and Defendant was in the rear passenger's side seat. Officer Jackson requested Mercadel's driver's license and the vehicle's registration, which were provided to Officer Jackson by Mercadel and Defendant. Officer Jackson advised Mercadel that he would be issuing him a warning for following too closely and

6

instructed Mercadel to exit the vehicle and accompany him to his patrol car. Mercadel complied and they went to Officer Jackson's patrol car. Officer Jackson had Mercadel stand near the front passenger side corner of the patrol car. Officer Jackson opened the front passenger door of his patrol car and stood on the other side of the door from Mercadel, creating a barrier between them. Officer Jackson positioned his computer so that he could run the records check on Mercadel from the front passenger side of his patrol vehicle. After running the records check, Officer Jackson grabbed his clip board and began filling out the warning form for Mercadel. (*Id.* at 24-29; Gov. Exhibit 2.)

While Officer Jackson was conducting the records check, Deputy Armijo spoke with the passengers. Deputy Armijo asked Collins and Defendant to exit the vehicle because he intended to deploy his dog for a sniff of the exterior of the vehicle. Collins and Defendant exited the vehicle and stood on the far-right shoulder of the interstate while Deputy Armijo deployed his dog on the exterior of the vehicle. Deputy Armijo deployed his dog at the same time Officer Jackson was performing the records check and writing the warning. (*Id.* at 32.) Deputy Armijo finished the dog sniff of the vehicle before Officer Jackson finished writing the warning. (*Id.* at 34.)

While writing the warning, Mercadel told Officer Jackson that he had recently been stopped for the same infraction—following too closely—and agreed to the written warning and signed it. (*Id.*) When Officer Jackson was done with the citation, Deputy Armijo spoke with Mercadel and informed him that his dog is trained to alert to marijuana, cocaine, methamphetamine, and heroin. Deputy Armijo also told Mercadel that his dog had a positive alert on the vehicle. Deputy Armijo asked Mercadel whether any of the four drugs his dog was trained to alert on were inside the car. Mercadel responded that he possessed a personal amount of marijuana in his black luggage inside the trunk of the vehicle. Officer Jackson and Deputy Armijo asked Mercadel's permission to search the vehicle. Mercadel gave them permission to search his luggage but stated that he was not the owner of the car and identified Defendant as the vehicle's owner. (*Id.* at 36-37.)

Officer Jackson and Deputy Armijo spoke with Defendant, who confirmed that the vehicle belonged to him. Defendant was advised that Deputy Armijo's dog had alerted for drugs inside the vehicle. Defendant was also advised that Mercadel told them marijuana was in the trunk of the car. The officers asked Defendant for his consent to search the vehicle.

Defendant gave consent to search Mercadel's luggage but did not consent to a search of the entire vehicle. (*Id.* at 38.)

Officer Jackson informed Defendant that, based on the positive dog alert and Mercadel's admission regarding the marijuana, he had "federal probable cause" to search the vehicle at that time. Upon searching the vehicle, law enforcement found four bundles of methamphetamine located in the trunk liner. (*Id.* at 39; Gov. Exhibit 2.) Upon locating the drugs, Defendant, Mercadel, and Collins were all taken into custody. (Gov. Exhibit 2.)

## IV. ANALYSIS

In his motion to suppress and related filings, defendant argues the Court should suppress evidence found in the search of his vehicle because: officers did not have probable cause to stop his vehicle based on a traffic violation; the traffic stop was unconstitutionally prolonged; officers did not have reasonable suspicion to stop his vehicle based on the CS' tip; the K-9 alert did not give officers probable cause to search his vehicle; and the collective knowledge doctrine cannot justify the stop. (Docs. 128, 151, and 173). Defendant also argued the government should be sanctioned for violating the Stipulated Discovery Order.[2] (Doc. 151, at 1-3).

In his objections to Judge Roberts' R&R, defendant argues Judge Roberts erred in in finding: (1) the government did not violate the Stipulated Discovery Order (Doc. 186, at 3-5); (2) a traffic violation occurred under New Mexico law, giving officers probable cause to stop the vehicle (*Id.*, at 5-9); (3) officers had reasonable suspicion to search

---

[2] In its supplemental briefing, the government argued that "any additional grounds for suppression raised at the suppression hearing or in defendant's supplemental briefing should [sic] be denied as untimely" and, if the Court allows the arguments to proceed, "the government would respectfully request and opportunity to respond and present evidence to fully develop the record on any new issues that may be raised." (Doc. 172, at 10-12). Judge Roberts recommended the Court deny as moot this issue, given that the issues were ultimately briefed in supplemental briefing and defendant filed his motion in keeping with the deadline. (Doc. 183, at 13-14). The Court agrees and the government did not object to the R&R. Thus, the Court denies as moot the government's timeliness issue.

based on information provided by the CS (*Id.*, at 9-10); (4) the traffic stop was not unconstitutionally prolonged (*Id.*, at 10-12); (5) the K-9 sniff provided probable cause to search defendant's vehicle (*Id.*, at 12-13), and; (6) collective knowledge doctrine applies (*Id.*, at 13-15).[3] (discussing Doc. 183). The Court addresses each objection in turn.

### A. Stipulated Discovery Order

Defendant argues that because the government knew a confidential source gave Inspector Husak the information he later shared with Officer Jackson, the government was required to share that it was relying on a confidential source even though no written report discussing the confidential source existed until after defendant filed his motion to suppress. (Doc. 186, at 3-5). At the hearing, Inspector Husak testified that he did not write a report about the CS' information because he wanted to protect the CS in the ongoing investigation. (Doc. 168, at 89). Defendant argues the information about the CS is discoverable because it forms the basis for the government's case against him and even if the prosecutor did not know that it existed, Inspector Husak did and that knowledge was imputed to the government. (Doc. 186, at 4 (citing *Kyles v. Whitley*, 514 U.S. 419, 432, 437 (1995))). Defendant argues the government "concealed the existence of a CS and only made a belated disclosure of his existence when it became strategically advantageous," and only the sanction of granting defendant's motion will sufficiently deter similar behavior. (*Id.*, at 5).

The Court agrees with Judge Roberts that sanctions are not warranted here. "The district court has broad discretion in imposing sanctions on parties for failing to comply with discovery orders." *United States v. Davis*, 244 F.3d 666, 670 (8th Cir. 2001). In considering whether a sanction is appropriate, courts generally look to reasons for the

---

[3] Defendant also objects to Judge Roberts' factual finding that the K-9 that performed the drug sniff on defendant's vehicle was certified. (Doc. 186, at 2 (citing Doc. 183, at 40 n.7)). The Court addresses this during its discussion of legal findings relating to the K-9 sniff.

delay and whether the delay was made in good faith or bad faith, whether the other party was prejudiced by the delay, and whether lesser consequences could adequately address the prejudice caused. *See id.* at 670-71 (collecting cases). The relevant sections of the Stipulated Discovery Order are in keeping with this approach.

The Stipulated Discovery Order reads:

> The Government will include in its discovery file, or otherwise make available, law enforcement reports (excluding evaluative material of matters such as possible defenses and legal strategies, or other attorney work product), grand jury testimony and evidence or existing summaries of evidence in the custody of the United States Attorney's Office that provide the basis for the case against Defendant. The file will include Rule 16, *Brady*, and Jencks Act materials of which the United States Attorney's Office is *aware and possesses*.

(Doc. 113, at 1) (emphasis added). In a footnote appended to the last sentence, the Order further states:

> Pursuant to the Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (2020), the Court confirms the Government's obligation to produce all exculpatory evidence to Defendant as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and orders it to do so. *Failing to do so in a timely manner may result in consequences* consistent with the law and circumstances of the violation, including, but not limited to, continuance of trial, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, or sanctions by the Court.

(*Id.*, at 1 n.2). The government's duty to disclose is ongoing. (*Id.*, at 4). *See also* FED. R. CR. P. 16(c). Also, as the Supreme Court wrote in *Kyles*, "[an] individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. at 437. (*See also* Doc. 186, at 14 ("Prosecutors cannot claim that evidence was unknown to them when the evidence was known to some other arm of the government, including a federal law enforcement agency."))

10

Here, as recounted in detail in Judge Roberts' R&R, Inspector Husak did not write a report about the CS' information around September 30, 2022, because investigators were still using the CS and needed to protect him, and Inspector Husak wanted to ensure that Officer Jackson did not use the CS' information as grounds for probable cause. The CS' existence was disclosed in the government's resistance to defendant's motion to suppress via Inspector Husak's report, which was written in response to defendant's motion to suppress, about two weeks before the suppression hearing. Defendant concludes that Inspector Husak "concealed" the fact that a CS was involved in the investigation and the government "concealed" the same because disclosing the CS later would be strategically advantageous.[4] But the government gained no strategic advantage from its alleged delayed disclosure. Defendant was able to review the evidence, cross-examine witnesses about it at the hearing and further brief the Court on the issue of the CS tip in both his reply to the government's resistance and his supplemental briefing. For these reasons, the Court cannot conclude that the government delayed in disclosing the report and the information therein. *See Davis*, 244 F.3d at 670-71. To the extent a delay existed, the Court cannot conclude that it was made in bad faith. *See id*. Further, defendant was not prejudiced by the government's failure to disclose the CS' role earlier, even if such disclosure was necessary. *See id*. The Court also notes that the information

---

[4] Implied in defendant's argument is the accusation that had he not filed a motion to suppress, the government might never have shared information about the CS. But the government would necessarily have been required to share that information because Officer Jackson only knew about defendant's vehicle because Iowa officers told him about it, based on the CS' tip. The Court has no reason to believe that the government would not have shared Inspector Husak's report as soon as it became available, even if no motion to suppress was pending.

Further, even if the government failed to share the report about the CS, the Court concludes, as discussed below and as Judge Roberts did, that Officer Jackson had probable cause to stop defendant's vehicle based on the traffic violation and probable cause to search the vehicle based on the K-9 sniff.

was not exculpatory and defendant does not argue otherwise. Accordingly, the Court finds that sanctions are not warranted. *See id.*

Having found that sanctions are not warranted, the Court need not assess the appropriate sanction for the violation defendant alleges. Thus, the Court overrules defendant's objection on this ground.

### B. Traffic Violation

Defendant argues the Court cannot find Officer Jackson had probable cause to stop defendant's vehicle based on the traffic violation of driving too closely because there is no objective evidence supporting the officer's belief that the vehicle was following too close, in part because his observations are not on video. (Doc. 186, at 5-6, 6 n.1). Instead, defendant asserts Officer Jackson based his opinion on a subjective rule of thumb New Mexico officers use to determine whether a vehicle is following too closely based on speed and distance between vehicles. (*Id.*, at 6 (discussing Govt's Exh. 7)). Defendant asserts that New Mexico law allows drivers to determine what is "reasonable and prudent" and gives drivers great latitude in this interpretation; accordingly, defendant argues, the rule of thumb defeats the statute's legislative intent. (*Id.*, at 6-7 (discussing N.M. STAT. § 66-7-318(A))). Defendant also asserts Officer Jackson fabricated the violation because the road conditions were all favorable and no other drivers showed signs that defendant's vehicle was being driven a reckless manner. (*Id.*, at 8-9).

For the following reasons, the Court agrees with Judge Roberts that Officer Jackson had probable cause to stop the vehicle based on New Mexico Law.

First, the government showed the violation was based on objective evidence. Officer Jackson testified under oath that he observed defendant's vehicle violate Section 66-7-318(A). That Section provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon the condition of the highway." N.M.

STAT. § 66-7-318(A). Officer Jackson's observations was corroborated by the driver's admission that he had previously been warned about driving too close behind another vehicle.[5]

Defendant focuses on the fact that Officer Jackson's cameras did not show the violation.[6] Officer Jackson explained this is because they begin recording after he hits the lights on his service vehicle. The Court interprets defendant as objecting to, in essence, the allegation being Officer Jackson's word against defendant's. But there is no requirement that an officer provide video testimony of the violation observed; instead, their testimony is sufficient. *See United States v. Diaz-Gomez*, CR No. 10-332 JP, 2010 WL 11483192 (D.N.M. Aug. 25, 2010) (finding reasonable suspicion to stop a vehicle based on a Section 66-7-318(A) violation, absent video evidence). And though defendant asserts that Officer Jackson fabricated the violation, he relies only on speculation in support. Defendant's speculation is not grounds for suppression absent evidence supporting that belief; instead, it is fodder for cross-examination.[7] The Court further

_____

[5] Defendant also asserts that because "signing the warning came with no consequence to a driver," the driver's admission in his warning "cannot reasonably be regarded as evidence of culpability." (Doc. 186, at 7). Assuming this is true, it does not affect the determination of whether probable cause to stop defendant's vehicle existed based on the traffic violation, because the driver's admission occurred afterward.

[6] The Court assumes this as true. Government's Exhibit 3 arguably shows a violation at the :40 mark, as Judge Roberts found. (Doc. 183, at 29). There, however, defendant's vehicle was close to the CMV in front of it after defendant's vehicle quickly switched lanes, apparently to make space for Officer Jackson's vehicle.

[7] Defendant asserts that Officer Jackson must have fabricated the violation because he did not stop any other vehicles during the hour he was positioned on the median before seeing defendant's vehicle and he wanted to stop defendant's vehicle to find drugs. (Doc. 186, at 7-8). The Court disagrees. Officers are permitted to stop a vehicle based on pretext, so long as a bonafide traffic violation exists. *Whren v. United States*, 517 U.S. 806, 810 (1996). Defendant has shown no evidence supporting that no violation existed. Instead, he asks the Court to find

13

notes that neither defendant, nor Mercadel, nor the other passenger testified at the suppression hearing. In other words, there was no evidence contradicting Officer Jackson's testimony. In short, this is not even a case of defendant's word against Officer Jackson's word. This is a case of an officer testifying under oath and a general denial by defendant.

Likewise, Officer Jackson's reliance on the three-second and car-length guidance used by New Mexico police does not prevent a finding of probable cause. (*See* Docs. 168, at 13 & Gov't Exh. 7). Defendant asserts these rules of thumb are subjective and thus an improper foundation for probable cause. (Doc. 186, at 6-7, 7 n.2). Defendant also suggests they are formulaic and thus an improper interpretation of the statute, in light of its legislative intent. (*Id.*). The Court finds Officer Jackson relied on objective evidence by using these rules of thumb. These rules are objective because they are formulaic applications considering speed and distance—two objective calculations—and are applied conservatively to catch "blatant violation[s]." (*See generally* Gov't Exh. 7). Because this evidence is objective, it is an appropriate basis for probable cause.

The Court agrees with defendant that Section 66-7-318(A)'s "reasonable and prudent" standard requires that the officer consider the circumstances surrounding the possible violation; but certain circumstances weigh more heavily than others. *See State v. Sanchez*, No. 34,170, 2016 WL 1546619, at *4 (N.M. Ct. App. Mar. 2, 2016) ("Here, the officer's testimony that he saw Defendant driving a single car length behind a motorcycle while traveling twenty-five miles per hour, which the district court credited, was sufficient to support rational inferences that would lead a reasonable person to believe Defendant had violated Section 66–7–318(A)." (cleaned up)). Here, those factors include

---

Officer Jackson fabricated the violation based on defendant's speculation alone. The Court declines to do so.

the speed and distance at which defendant's vehicle was following the vehicle in front of it, and the fact that other vehicle was a CMV. According to Officer Jackson's testimony, following as close as defendant's vehicle was following is not reasonable or prudent even under the best of road conditions. Specifically, Officer Jackson testified that following a CMV at a length of one-and-a-half cars, as he testified he saw defendant's vehicle do, is neither reasonable nor prudent because following a CMV that closely prevents the CMV's driver from seeing defendant's vehicle. Officer Jackson also testified that following this closely at 75 mph creates a substantial risk of accidents because CMVs have slower reaction times due to their size and weight, and because 75 mph is a higher rate of speed than the CMV could travel. (Doc. 168, at 12-13, 15-18). In sum, Officer Jackson concluded that defendant's vehicle was following too closely even on a day with perfect conditions.[8] (*See id.*, at 12-13, 15-18, 53-55). Though the language of Section 66-7-318(A) is relatively open-ended, interpreting it as allowing a driver to follow a CMV at the speed and distance Officer Jackson described would be contrary to the statute's plain language, and, frankly, common sense.

In sum, based on the evidence presented, there was a fair probability that the driver of defendant's vehicle committed a traffic violation and therefore Officer Jackson had probable cause to stop the vehicle. *See United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020). Thus, the Court overrules defendant's objection on this ground.

---

[8] Accordingly, the evidence does not support that Officer Jackson failed to apply a "certain measure of flexibility . . . necessary to ensure public safety and uniform enforcement of traffic rules." (*See* Doc. 186, at 7 n.2 (quoting *State v. Sanchez*, No. 34,170, 2016 WL 1546619, at *3 (N.M. Ct. App. Mar. 2, 2016))).

Relatedly, the Court agrees with Judge Roberts' conclusion that "*Sanchez* does not support the proposition that the discretion of a driver trumps the determination of a law enforcement officer that an individual is following too closely." (Doc. 183, at 28).

### C. CS' Tip

Defendant argues Judge Roberts erred in concluding the CS was reliable because the CS did not "ever before provided reliable information that assisted the police in uncovering criminal activity." (Doc. 186, at 9-10). Defendant also argues officers corroborated only innocent, static details that the CS provided and did not corroborate "that the vehicle had ever been in Arizona, where the CS claimed drugs would be acquired." (*Id.*). Thus, defendant asserts, because the CS was not reliable, his tip did not constitute reasonable suspicion to stop defendant's vehicle, as Judge Roberts found. (*Id.*).

For the following reasons, the Court finds, as Judge Roberts did, that the CS was sufficiently reliable and thus Officer Jackson had reasonable suspicion to stop defendant's vehicle. Before proceeding in its analysis, the Court notes that the government need only show that the CS' tip was sufficiently reliable to support reasonable suspicion—in other words, the tip must provide some minimal objective justification for making the stop. *See Alabama v. White*, 496 U.S. 325, 329-30 (1990). Accordingly, "[r]easonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id.*

When an informant is anonymous or known and unproven, as here, courts engage in a totality-of-the-circumstances analysis to determine whether sufficient indicia of reliability exists. *See United States v. Mays*, 993 F.3d 607, 615 (8th Cir. 2021); *United States v. Nolen*, 536 F.3d 834, 839-40 (8th Cir. 2008). *See also Illinois v. Gates*, 462 U.S. 213, 239 (1983) (abandoning earlier two-pronged test in favor of totality-of-the-circumstances analysis). The Court agrees with Judge Roberts that based on the totality of the circumstances here, the CS was sufficiently reliable. *See Navarette v. California*, 572 U.S. 393, 398-99 (2014); *United States v. Manes*, 603 F.3d 451, 456 (8th Cir. 2010); *Florida v. J. L.*, 529 U.S. 266, 272-74 (2000); *White*, 496 U.S. at 330-32. The CS'

information was based on a face-to-face conversation with defendant, who visited the CS at the CS' home and told the CS that he was traveling to Phoenix, Arizona to pick up methamphetamine. The CS provided the information to officers within days immediately following defendant's visit and defendant was arrested within only a few hours afterwards, making the report and investigation fairly contemporaneous. Also, the CS' information about defendant's vehicle and home matched what officers knew. Before sharing the information with Officer Jackson, the Iowa officers corroborated information about defendant's vehicle and residence.[9] The CS also had a history of engaging in methamphetamine distribution with defendant and informed officers that defendant was transporting methamphetamine from Phoenix to Cedar Rapids. Accordingly, officers had reason to believe the CS had knowledge of concealed criminal activity. Officers also corroborated the location of defendant's vehicle—though not in Arizona, it was traveling through New Mexico in the direction one would likely travel from Phoenix to Cedar Rapids, consistent with the CS' report of defendant's travel plans.[10] This suggests the CS had special familiarity with defendant's plans. Further, officers were already investigating defendant for a drug distribution conspiracy. Finally, the fact that the CS is known to officers weighs in favor of reliability because a known informant knows he

---

[9] Defendant's argument that these are merely innocent, static details and thus cannot result in a finding that defendant is credible is unavailing. As support, defendant cites *United States v. Gibson*, 928 F.2d 250, 253 (8th Cir. 1991), *United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993), and *United States v. Wilhelm*, 80 F.3d 116, 120 (4th Cir. 1996). Those cases are all distinguishable because here, unlike in those cases, the informant had a personal relationship with defendant. *See Gibson*, 928 F.2d at 253 (finding anonymous informant was not reliable when informant had no apparent special familiarity with the defendant); *Mendonsa*, 989 F.2d at 369 (same); *Wilhelm*, 80 F.3d at 120 (same).

[10] Thus, officers' failure to corroborate whether defendant's vehicle had indeed been in Arizona is inconsequential.

can be held accountable for any false information he might give to officers. This mitigates any concern that the CS may not be truthful with officers in the past, as defendant implies.

For these reasons, the CS was reliable and his information corroborated such that Officer Jackson had reasonable suspicion to stop defendant's vehicle based on the CS' tip. *See United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) ("Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated."). Thus, the Court overrules defendant's objection on this ground.

### D. *Prolonged Stop*

Defendant argues that Officer Jackson was not "merely conversational," as Judge Roberts concluded, when speaking with Mercadel, the driver of defendant's car. (Doc. 186, at 9). Instead, defendant asserts, Officer Jackson was "interrogati[ng]" Mercadel with questions "unrelated to the purpose of the traffic stop," resulting in a constitutional violation because Officer Jackson's questioning prolonged the stop beyond completing the routine tasks associated with issuing a warning. (*Id.*, at 10-11). Defendant also disagrees with Judge Roberts' conclusion that Officer Jackson's questions were not "drug interdiction questioning." (*Id.*, at 11 (citing *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008)). Further, defendant asserts the record does not show when Officer Jackson should have finished the routine tasks associated with issuing a warning, had Officer Jackson "not engaged in improper interrogation." (*Id.*, at 11-12).

The Court agrees with Judge Roberts' conclusions and ultimate finding that Officer Jackson's questions did not prolong the stop.

First, there is no evidence Officer Jackson's questions prolonged the stop beyond completing the routine tasks associated with issuing a warning. As Officer Jackson asked Mercadel questions, he was running checks on the computer regarding the vehicle registration and Mercadel's information according to his standard procedure. (Doc. 168, at 27, 29). Officer Jackson testified he was multitasking. (*Id.*, at 29). The dash camera

18

video supports this. (Gov't Exh. 4). Thus, the Court cannot find, as defendant urges, that Officer Jackson must have prolonged the stop simply because he asked Mercadel questions and asking and answering questions "takes time." (Doc. 186, at 11). Describing his standard traffic stop procedure, Officer Jackson testified: "I ask them all about their travels if they're willing to communicate with me. It's not a mandatory, that they talk to me, but if they do decide to talk to me, I engage." (Doc. 168, at 28). Accordingly, the questions did not constitute drug interdiction questioning. Instead they were, as Judge Roberts concluded, conversational. It is true that certain questions could be seen as inquiries about the movement of defendant's vehicle to determine whether it transported drugs as the CS said it would. But even if Officer Jackson's questioning was for purposes of drug interdiction, the relationship between questioning and drug interdiction does not render a stop unconstitutionally prolonged by that questioning. A stop "'can become unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a warning ticket," but is not unlawful if "unrelated inquiries do not measurably extend the duration of the stop." *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (first quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) and second quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)) (cleaned up). *See also Peralez*, 526 F.3d at 1120 (officer's "blended questioning" extended the time it took for him to process driver's warning because he delayed in submitting a license check). Here, there is no evidence that Officer Jackson's questions unrelated to the warning measurably extended the stop's duration.

Finally, defendant's assertion that the government must show evidence of how long the stop would have been absent the questioning is misplaced. Defendant asserts "[t]he question is not 'when did [Officer] Jackson finish the routine tasks associated with a traffic stop' but 'when should [Officer] Jackson have finished those routine tasks?'" and that the government fails to answer this question. (Doc. 186, at 11 (citing *Rodriguez*,

Case 1:22-cr-00091-CJW-MAR   Document 193   Filed 07/26/23   Page 19 of 24

575 U.S. at 354)). As discussed, the question is whether Officer Jackson's questions prolonged the stop "beyond the time *reasonably required* to complete the mission of issuing a warning ticket." *Rodriguez*, 575 U.S. at 354-55 (cleaned up and emphasis added). The government's evidence answers this question. The government is not required to show this because the question of the time reasonably required to issue a warning depends on its own circumstances. Moreover, it is irrelevant here because the Court has found, as Judge Roberts did, that the Officer Jackson's questioning was simultaneous with his duties directly related to the violation warning.

For these reasons, Officer Jackson's questions did not prolong the stop. Thus, the Court overrules defendant's objection on this ground.

### E.     *K-9 Sniff*

Defendant argues the K-9 sniff cannot provide probable cause to search defendant's vehicle for three reasons: (1) the evidence did not support that the K-9 was certified and thus the K-9 was not reliable; (2) the K-9's alert did not differentiate between marijuana, a legal substance to possess under New Mexico law, and the three other narcotics to which the K-9 could alert, and; (3) the K-9 could not distinguish between marijuana and hemp, a legal substance to possess under federal law. (Doc. 186, at 2-3, 12-13).

The Court begins by noting that it is unclear whether defendant's arguments about certification was presented to Judge Roberts. When considering objections to a magistrate judge's report and recommendation, a court cannot consider arguments not squarely presented before the magistrate judge. *Roberts v. Apfel*, 222 F.3d 466, 470 (8th Cir. 2000). However, out of an abundance of caution, the Court considers this argument.

For the following reasons, the Court agrees with Judge Roberts' factual finding that the K-9 that performed the drug sniff on defendant's vehicle was certified and his legal finding that the K-9 was reliable. Defendant asserts that because Officer Jackson

could not testify to the K-9's certification based on his personal knowledge and because no other evidence supported the K-9's certification, the Court cannot conclude that the K-9 was certified. (Doc. 186, at 2-3). Strictly speaking, Judge Roberts did not find the K-9 was certified; rather, he impliedly concluded the K-9 was properly trained and reliable based on the testimony presented and the fact defendant did not question the K-9's training or reliability. (Doc. 183, at 40 (citing *United States v. Rederick*, 65 F.4th 961, 967 (8th Cir. 2023)) & 40 n.7). Still, reliability relates to certification. *See United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) ("A drug detection dog is considered reliable when it has been trained and certified to detect drugs.") (quotation omitted).

"Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust [the dog's] alert"; but the government need not show evidence of either because "a finding of a drug-detection dog's reliability cannot depend on the [government's] satisfaction of multiple, independent evidentiary requirements." *Florida v. Harris*, 568 U.S. 237, 245-47 (2013). "No more for dogs than for human informants is such an inflexible checklist the way to prove reliability, and thus establish probable cause." *Id.*, at 245. Though Officer Jackson did not testify to the K-9's certification directly, he testified to it indirectly by testifying: "Any dog that is not certified we do not allow out on the team." (Doc. 168, at 75 (in response to Judge Roberts' question)). This testimony was based on personal knowledge. There was also no evidence in the record that would refute the K-9's certification. *Winters*, 600 F.3d at 967 ("Contrary evidence that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog.") (quotation omitted). Importantly, part of the purpose of testimony as to reliability is so a defendant has the opportunity to question the K-9's certification or training. *Harris*, 568 U.S. at 247. Defendant had such an opportunity here, but declined to do so. (*See* Doc. 168, at 76). Though the Court might have expected the government to directly question Officer Jackson or another witness

regarding the K-9's reliability, and might have expected defense counsel to cross-examine Officer Jackson about it, the Court does not conclude that the evidence is not sufficient to show reliability here. Thus, the Court overrules defendant's objection both as to Judge Roberts' factual finding that the K-9 was certified and as to Judge Roberts' legal finding that the K-9 was reliable.

The Court also agrees with Judge Roberts that the K-9's alert provides probable cause to search despite not differentiating between marijuana and the three other narcotics the K-9 is trained to smell. The fact that the marijuana in defendant's vehicle could be lawfully possessed under New Mexico law is inconsequential to the analysis of probable cause under federal law. Under federal law, marijuana is still a controlled substance. *Gonzalez v. Raich*, 545 U.S. 1, 27 (2005). "It is well-established that federal law—not state law—governs the admissibility of evidence in a federal criminal prosecution." *United States v. Spikes*, No. 19- cr-264-WJM, 2021 WL 1853419, at *7-8 (D. Colo. May 10, 2021) (discussing *California v. Greenwood*, 486 U.S. 35, 43-45 (1988)). Accordingly, whether the K-9 sniffed marijuana or one of the three other narcotics, any result created probable cause to search defendant's vehicle. Thus, the K-9's failure to discern amongst the four drugs does not prevent a finding of probable cause.

Finally, it does not appear that Judge Roberts explicitly addressed defendant's hemp argument, raised in defendant's supplemental briefing (Doc. 173, at 6 n.1). Nevertheless, the Court finds defendant's argument unavailing. Defendant argues that because hemp is no longer a controlled substance under federal law, and K-9s cannot distinguish between marijuana and hemp, the K-9's alert cannot support probable cause. (Doc. 186, at 13). As a preliminary matter, defendant's argument assumes that the K-9 alerted for marijuana. In hindsight, given what officers located in defendant's car, it is probable that the K-9 alerted to both marijuana and methamphetamine—though any combination or even another substance could have been the reason for the alert.

Nevertheless, without evidence showing what caused the alert, the Court analyzes defendant's argument as if the K-9 alerted to marijuana only.

In the context of a vehicle search, probable cause exists "when a reasonably prudent person would look at the facts and circumstances and believe that contraband or evidence of a crime will be found if a vehicle were to be searched." *United States v. Valle Cruz*, 452 F.3d 698, 703 (8th Cir. 2006) (internal quotation omitted). Officer Jackson knew the K-9 alerted to a controlled substance in defendant's vehicle. Officer Jackson also knew the CS told Iowa officers defendant asked if the CS wanted to purchase methamphetamine from Arizona and defendant left the CS' home, apparently on his way to Arizona, in the same vehicle Officer Jackson stopped. Importantly, Officer Jackson also knew that Mercadel had admitted to having marijuana—not hemp—in defendant's vehicle. A reasonably prudent person would not believe the K-9 was alerting to marijuana when the actual substance was hemp when the driver admitted to possessing marijuana in the vehicle. Instead, a reasonably prudent person would look at the facts and circumstances and believe that contraband would be found in defendant's vehicle.[11]

For these reasons, the K-9 sniff was reliable and, in light of the facts and circumstances, provided probable cause to search defendant's vehicle. Thus, the Court overrules defendant's objection on this ground.

### F. Collective Knowledge Doctrine

Defendant argues that to the extent Judge Roberts relies on the collective knowledge doctrine, that doctrine is inapplicable here because the relevant officers were

---

[11] Accordingly, the Court need not reach the question of whether a K-9 alert for marijuana can serve as the basis for probable cause when the K-9 cannot distinguish between marijuana and hemp. The Court would note, however, that probable cause does not require certainty. While it is theoretically possible that a drug dog may alert to hemp and not marijuana, that a drug dog alerts to the presence of a controlled substance would appear to give rise to probable cause to believe marijuana (or some other controlled substance) is present, even if it later turns out to be hemp.

23

not acting as a search team. (Doc. 186, at 13-15). Defendant asserts the testimony of both Officer Jackson and Inspector Husak confirmed this—particularly Inspector Husak's note in his email to Officer Jackson not to rely on information from Inspector Husak as probable cause for a stop. (*Id.*, at 14-15).

As defendant acknowledges (*Id.*, at 14), Judge Roberts relies on the collective knowledge doctrine as an alternative justification for the stop (Doc. 183, at 40). Here, the Court need not reach the issue of collective knowledge because Officer Jackson had probable cause to stop the vehicle.

Thus, the Court overrules defendant's objection on this ground.

### V. CONCLUSION

For the reasons set forth above, defendant's objections (Doc. 186) are **overruled**. The Court **adopts** Judge Roberts' R&R (Doc. 183) and **denies** defendant's Motion to Suppress (Doc. 128).

**IT IS SO ORDERED** this 26th day of July, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa